**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 01-11424

HERRMANN HOLDINGS LTD.; ANNEM INVST. LTD.;
HERRMANN TECHNOLOGY TRUST,

Plaintiffs-Appellants,

versus

LUCENT TECHNOLOGIES INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

September 3, 2002

Before DAVIS, DeMOSS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Herrmann Holdings, Ltd., AnnEm Investments, Ltd., and Herrmann Technology Trust (collectively, "the Herrmanns") appeal the district court's dismissal, for failure to comply with Federal Rules of Civil Procedure 9(b) and 12(b)(6), of their claims against Lucent Technologies Inc. ("Lucent"). For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

First we will summarize the facts alleged in the Herrmanns' second amended complaint, which for purposes of Lucent's motion to dismiss pursuant to Rule 12(b)(6) and 9(b) are accepted as true and construed in the light most favorable to the Herrmanns.[1]

The Herrmanns owned all 1,000,000 of the outstanding shares of common stock of Herrmann Technology, Inc. ("HTI"), which designed and developed passive thin film filters for use in telecommunications optical networking. On June 16, 2000, Lucent and the Herrmanns signed an Agreement and Plan of Merger ("Agreement"), whereby Lucent acquired HTI for 6,770,200 shares of Lucent stock, worth approximately $438 million based on the closing stock price of $60 that day.

The Herrmanns could not sell any of their Lucent stock in a public transaction on the open market until Lucent filed, and the Securities and Exchange Commission ("SEC") declared effective, a Form S-3 registration statement ("S-3"). The Herrmanns insisted that this happen as soon as practicable. To that end, section 5.1 of the Agreement provides that

> Lucent shall use its *reasonable best efforts to prepare, file and cause to become effective, as promptly as practicable* after Lucent shall have received all relevant information to be provided by the Company or the Shareholders in connection with such filing, the Registration Statement covering the public resale of such shares of Lucent Common Stock to be issued in connection with the Merger . . . .

Agreement (emphasis added). The Herrmanns provided Lucent with all of the "relevant information" for Lucent's preparation of the S-3 prior to the June 16th closing. Section 5.8 of the Agreement similarly obligated Lucent to

---

[1]Our summary also includes the contents of the Agreement and Plan of Merger attached to Lucent's motion to dismiss, which the district court included in its review. See Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000) (holding that on a motion to dismiss for failure to state a claim, the district court properly considered documents attached not to the pleadings, but to the defendant's motion to dismiss).

use its *reasonable best efforts to take or cause to be taken all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective in the most expeditious manner practicable*, the transactions contemplated by this Agreement including (i) . . . the making of all necessary registrations and filings and the taking of all reasonable steps as ay be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by any governmental or regulatory authority.

Id. (emphasis added). Section 14(q) of the Agreement defined "reasonable best efforts" as "prompt, substantial and persistent efforts as a prudent Person desirous of achieving a result would use in similar circumstances; provided that the Company, the Shareholders, Lucent or Acquisition, as applicable, shall be required to expend only such resources as are commercially reasonable in the applicable circumstances." Id. Lucent was obligated to pay all costs, expenses, and fees in connection with the registration of the S-3.

On June 20, the Herrmanns called Lucent's counsel to check on the status of Lucent's filing of the S-3. On June 27, 2000, eleven days after the HTI acquisition, Lucent acquired Chromatis Networks ("Chromatis"), a much larger optical networking company, for approximately $4.3 billion in Lucent stock based on the closing stock price of $57.70. That day, Lucent's counsel reported to HTI that Lucent was "preparing the S-3 filing" and asked whether it was okay to "delay filing the [HTI] S-3 for a week or two to build in the [HTI] S-3 into our Chromatis S-3." The next day, the Herrmanns responded that they did not want delay, did not want Lucent to combine the HTI S-3 with the Chromatis S-3, and instructed Lucent to "please proceed with the preparation of the S-3 for [HTI] only."

On June 30, 2000, Lucent sent the Herrmanns questionnaires seeking information for preparing the S-3. Although the Herrmanns had given this information to Lucent before closing, the Herrmanns completed and sent back the questionnaires on July 3, 2000. On July 13, 2000, the

3

Herrmanns contacted Lucent's counsel about the status of the S-3. Lucent's counsel said that he did not understand the cause for the delay and would check on it. When the Herrmanns called Lucent's counsel again, he reported that Lucent expected to file the S-3 sometime during the following week.

On July 20, 2000, Lucent reported disappointing third quarter results, a net loss of $301 million compared with the net income of $763 million a year earlier, and lowered its fourth quarter estimates. Lucent's stock price fell that day from $64.50 to $54.31. The following day, Lucent sent the Herrmanns a draft S-3, which combined the HTI S-3 and the Chromatis S-3.

Lucent filed the combined HTI/Chromatis S-3 on July 28, 2000, six weeks after the HTI acquisition. The SEC declared the S-3 effective on August 7, 2000. Lucent's stock closed that day at $42.06 per share and continued to decline, due in part to disappointments in its optical networking business.

On March 30, 2001, the Herrmanns brought suit against Lucent. In their second amended complaint, the Herrmanns alleged claims for breach of contract and violations of article 581-33 of the Texas Securities Act and section 27.01 of the Texas Business and Commerce Code. On May 14, 2001, Lucent filed a motion to dismiss the Herrmanns' claims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). On October 5, 2001, the district court granted the motion, refused the Herrmanns' request for leave to amend their complaint, and entered final judgment in favor of Lucent. The Herrmanns now appeal.

## DISCUSSION

I.      Standard of Review

We review *de novo* dismissals pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted or pursuant to Rule 9(b) for failure to plead fraud with particularity.

4

Askanase v. Fatjo, 130 F.3d 657, 669 (5th Cir. 1997). In doing so, we accept as true the well-pleaded factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 357-58 & n.104 (5th Cir. 2002); Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1017 (5th Cir. 1996). The dismissal will be upheld only if "it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief." U.S. ex rel Thompson v. Columbia HCA/Healthcare Corp., 125 F.3d 899, 901 (5th Cir. 1997).

We review the denial of leave to amend the complaint for abuse of discretion. Lewis v. Fresne, 252 F.3d 352, 356 (5th Cir. 2001).

II.     Breach of Contract

The Herrmanns complain first that the district court erred in dismissing their breach of contract claim. The resolution of this issue turns on whether, under Texas law, the Herrmanns' allegations that Lucent failed to use its "reasonable best efforts" to file and cause to become effective a S-3 covering the shares of Lucent stock, as required by § 5.1 and § 5.8 of the Agreement, give rise to a claim against Lucent for breach of contract. As our jurisdiction in this case is based on diversity of citizenship, we have a duty to apply Texas law. See Erie R. Co. v. Tompkins, 304 U.S. 64, 79-80 (1938). The Texas Supreme Court has not yet ruled on the enforceability of best efforts clauses in breach of contract actions. Accordingly, in deciding this case, we are required to make an Erie guess as to what the Texas Supreme Court would most likely decide. Barfield v. Madison County, Miss., 212 F.3d 269, 271-72 (5th Cir. 2000). Our task is to "attempt to predict state law, not to create or modify it." United Parcel Service, Inc. v. Weben Indus., Inc., 794 F.2d 1005, 1008 (5th Cir. 1986). In making an Erie guess, we defer to intermediate state appellate court decisions "unless convinced

5

by other persuasive data that the highest court of the state would decide otherwise." First Nat'l Bank of Durant v. Trans Terra Corp., 142 F.3d 802, 809 (5th Cir. 1998). We may also refer to rules in other states that Texas courts might look to. Hill v. London, Stetelman, & Kirkwood, Inc., 906 F.2d 204, 207 (5th Cir. 1990). The Texas courts have not considered contractual obligations to use "reasonable best efforts" to file a S-3 "as promptly as practicable" and "in the most expeditious manner practicable." No Texas case precludes the Herrmanns' recovery for breach of such obligations. Based on our review of decisions by Texas courts and courts in other jurisdictions, we conclude that the Texas Supreme Court would decide that dismissal of the Herrmanns' breach of contract claim at the 12(b)(6) stage is premature.

The district court found an intermediate appellate Texas court ruling on the enforceability of best efforts clauses in breach of contract actions to be instructive. See CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc., 809 S.W.2d 577 (Tex. App. 1991). In CKB, the Dallas Court of Appeals considered CKB's agreement "to use its best efforts to process [15,000 barrels per day of] crude oil into the volumes of refined products reflected on Exhibit A, with variations not to exceed plus or minus one percent." Id. at 578-79. The court explained that

> to be enforceable, a best efforts contract must set some kind of goal or guideline against which best efforts may be measured. A contracting party that performs within the guidelines fulfills the contract regardless of the quality of its efforts. When a party misses the guidelines, courts measure the quality of its efforts by the circumstances of the case and by comparing the party's performance with that of an average, prudent, comparable operator.

Id. at 581-82 (internal citations omitted). The goal set by the best efforts clause of the contract was the production of a specified volume of refined crude oil. Id. at 578. CKB failed to meet this specific contractual goal, thus "miss[ing] the guideline[]." Id. Consequently, in determining whether the best

efforts clause had been violated, the court considered evidence of the circumstances surrounding CKB's performance. Id. at 582. The court found, as a matter of law, that CKB breached its contractual obligation to use its best efforts to produce the volumes specified in the contract, and affirmed summary judgment for Moore McCormack Petroleum on its breach of contract claim. Id.

Relying on CKB, the district court dismissed the Herrmanns' claim pursuant to Rule 12(b)(6) after concluding that they had no claim for breach of contract. The district court determined that, in the absence of any specific date in the contract by which filing or registration was to be accomplished, the only objective goal or guideline established in the Agreement was for Lucent to file and cause to become effective a S-3 covering the Herrmanns' shares. The court held that because Lucent met that goal when the S-3 was filed on July 28, 2001 and became effective on August 7, 2001, Lucent satisfied its contractual obligations, regardless of the quality of its efforts. The district court reasoned "that the law of Texas does not contemplate that in considering whether the goal has been accomplished in the first instance, a court should have to look to the circumstances of the case or to comparable performances."

Being Erie-bound, the district court was correct in relying on the analysis in CKB to determine whether the Herrmanns stated a claim against Lucent for breach of its obligation to use best efforts. According to CKB, it must initially be determined whether the best efforts contract set "some kind of goal or guideline"–i.e., the objective to be accomplished by a party's best efforts–against which the party's best efforts may be measured. 809 S.W.2d at 581. If the answer to this threshold question is no, the best efforts contract is not enforceable. Id. If, however, there is a goal, the next inquiry is whether the party met the goal. Id. at 582. If the answer to this question is yes, the analysis ends and whether the party used its "best efforts" is irrelevant. Id. If, however, the goal is not met,

7

it becomes necessary to measure the party's efforts "by the circumstances of the case and by comparing the party's performance with that of an average, prudent, comparable operator." Id.

We must part company, however, with the district court's application of this framework to the Herrmanns' claim. Specifically, the district court's error lies in its narrow reading of the "some kind of goal or guideline" that is required to enforce a best efforts clause under CKB. The district court held that as long as Lucent filed the S-3 and caused the S-3 to become effective, it met the only objective goal or guideline established in the Agreement. In doing so, the court found that without any specific date in the Agreement, by which Lucent's registration tasks were to be accomplished, the "as promptly as practicable" and "in the most expeditious manner practicable" language of the Agreement was not a suitably objective goal against which Lucent's efforts could be measured. We find that this reading is problematic for the following reasons. To begin with, placing no limit on how long Lucent could wait to file the S-3 renders the timeliness language in § 5.1, § 5.8, and § 14(q) of the Agreement meaningless in an action seeking damages for breach of contract. As a general rule of contract interpretation, courts should attempt to give meaning to each clause in a contract. Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 741 (Tex. 1998) ("Our primary goal . . . is to give effect to the written expression of the parties' intent. We must read all parts of the contract together, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative." (internal citations omitted)). Thus, it would be inappropriate to disregard the time requirement that Lucent act "as promptly as practicable" and "in the most expeditious manner practicable," which modifies the ultimate objective of filing and causing the S-3 to become effective.

Moreover, neither CKB nor any other Texas case supports the position that in a case where the best efforts clause relates to timeliness or the time that a task must be completed, the "some kind

8

of goal or guideline" must be date specific. Indeed, CKB was a quantity case, as opposed to a time case. Although the goal set by the best efforts clause that was enforced in CKB was the production of a specified volume of refined crude oil, CKB does not stand for the proposition that only goals which set forth a definite quantity are enforceable. Requiring contracting parties to fix a date certain in order to set a temporal guideline in which to complete a certain task demands more definiteness than Texas law requires.

Finally, the possibility that compliance with a goal or guideline would have to be decided at the summary judgment stage or later does not justify refusing to enforce it. Here, the district court could not address whether or not Lucent accomplished the goal of filing and causing the S-3 to become effective "as pro mptly as practicable" and "in the most expeditious manner practicable" without looking beyond the complaint to some sort of evidence, such as the time involved in any of Lucent's prior S-3 filings. The district court concluded that because this analysis would involve considering the circumstances of the case or comparable performances, which, under CKB, does not come into play until a failure to meet the goal has been established, the timeliness language could not be included in the goal or guideline of the Agreement. Again, we do not agree with this restrictive application of CKB. While CKB held that in the final stage of the analysis, courts determine whether a party used its "best efforts" by looking to the circumstances of the case and comparable performances, CKB did not suggest that courts cannot consider such evidence in the previous stage of the analysis to determine whether a party met the "goal or guideline" against which a party's best efforts are measured.

Case law from other jurisdictions supports factoring the "as promptly as practicable" and "in the most expeditious manner practicable" language into discerning the goal or guideline of the

9

Agreement. In <u>KERS & Co. v. ATC Communications Group, Inc.</u>, the contract obligated ATC Communications Group, Inc. ("ATC") to "as soon as practicable, use its best efforts to effect the registration of [register shares subject to a purchase option]" after KERS & Company ("KERS") made a demand for registration. 9 F. Supp. 2d 1267, 1269 (D. Kan. 1998). The contract also gave ATC the option to delay filing of its registration for up to ninety days from its receipt of the request. <u>Id.</u> After receiving KERS' request, ATC had the discretion to postpone filing for almost three months, but delayed registering the shares for almost four months. <u>Id.</u> at 1270. The court granted summary judgment for KERS on its breach of contract claim, finding that the uncontroverted facts established that ATC violated its obligation to use its best efforts to register the shares. <u>Id.</u> at 1271.

In <u>Thomas de la Rue AG v. United States Banknote Corp.</u>, the United States Banknote Corporation ("Banknote") acquired a company, transferring Banknote stock to Thomas de la Rue AG ("TDLR") as part of the consideration for the sale, and agreed that, upon the TDLR's written request that Banknote register the shares, it "would prepare and file the registration statement 'as expeditiously as possible' and would thereafter use its 'best efforts' to cause the registration statement to become effective." 979 F. Supp. 968, 970 (S.D.N.Y. 1997). The contract did not contain any "specific time limit" for filing the registration statement. <u>Id.</u> Banknote did not file the registration statement until nearly six months after the TDLR's written request for registration. <u>Id.</u> This delay was the result of Banknote's potential acquisition of another company and a debt restructuring. <u>Id.</u> The TDLR sued Banknote for breach of contract. <u>Id.</u> at 971. The TDLR moved for partial summary judgment, seeking a determination, as a matter of law, that Banknote breached the provision requiring it to register the stock "as expeditiously as possible." <u>Id.</u> The court held that "the registration provision is not ambiguous; it imposes an obligation on [the defendant] to act as

10

expeditiously as reasonably possible under the circumstances." Id. at 972. The court also held that genuine issues of material fact, precluding summary judgment, existed as to whether the defendant acted "as expeditiously as possible" in registering the stock and, thus, it was for the jury to decide whether the delay was a breach of the defendant's obligations under the contract. Id. at 972-73.

Thus, we conclude that the goal or guideline established by the best efforts provision in the Agreement was for Lucent to file and cause to become effective, "as promptly as practicable" and "in the most expeditious manner practicable," a registration statement covering the Herrmanns' shares. Here, by alleging that the parties had a contract, that it contained two "best efforts" provisions that required Lucent to file and cause the S-3 to become effective "as promptly as practicable" and "in the most expeditious manner practicable," that Lucent breached that contractual obligation, and that the Herrmanns suffered damages as a result of that breach, the Herrmanns successfully state a claim for breach of contract. See, e.g., In re Absolute Res. Corp., 76 F. Supp. 2d 723, 733 (N.D. Tex. 1999); Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co., 3 S.W.3d 112, 127 (Tex. App. 1999); Cadle Co. v. Castle, 913 S.W.2d 627, 631 (Tex. App. 1995). Therefore, the district court erred in dismissing the Herrmanns' breach of contract claim.

III.    Texas Securities Act

The Herrmanns next argue that the district court erred in dismissing their claim under article 581-33 of the Texas Securities Act ("TSA"). The TSA imposes liability on those who offer or sell securities "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." TEX. REV. CIV. STAT. ANN. art. 581-33 (Vernon Supp. 2001).

In Count 2 of their complaint, the Herrmanns allege that "Lucent offered and sold a security by means of an untrue statement of a material fact, and by means of an omission to state a material fact." Specifically, the Herrmanns allege that Lucent's failure to perform its contractual obligations to use its "reasonable best efforts" makes its representations in § 5.1 and § 5.8 of the Agreement–i.e., that it would "use its reasonable best efforts to prepare, file and cause to become effective" the S-3 and would "use its reasonable best efforts to take or cause to be taken all actions, and to do or cause to be done, all things necessary in the most expeditious manner practicable" to file the S-3 and make it effective–untrue statements of a material fact. The Herrmanns also allege that "Lucent omitted to tell the Herrmanns that Lucent intended to and would delay filing the HTI Form S-3, and more particularly that it would delay filing the HTI S-3 until it could be combined with the Chromatis S-3." Further, for purposes of the TSA claim only, the Herrmanns expressly "disavow[ed] and disclaim[ed] an allegation of fraud."

The district court concluded that, in representing that it would use its "best efforts" to file the S-3, Lucent was making a promise of future performance, as opposed to a statement of past or existing material fact. Reco gnizing that, "[u]nder Texas law, [the Herrmanns] can only state a cognizable claim for misrepresentation of a 'future promise' by establishing a lack of intent to perform at the time of the promise," the district court dismissed the Herrmanns' TSA claim because they expressly rejected the notion that Lucent never intended to use its "reasonable best efforts" to file the S-3. The Herrmanns, however, argue that fraudulent intent or scienter is not an element of a claim

12

under article 581-33, and that they alleged that Lucent made untrue statements of an existing material fact in the Agreement, as well as untrue promises of future performance.[2]

We first address the contention that the Herrmanns "expressly and by reasonable inference alleged that Lucent made 'untrue statements' of a 'present and existing fact.' " The Herrmanns identify § 5.1 as the source of the alleged untrue statements of existing material fact. Specifically, they point to allegations that at the time Lucent agreed to use "its reasonable best efforts to prepare, file and cause [the S-3] to become effective, as promptly as practicable after Lucent shall have received all relevant information," Lucent had already received "all relevant information." Thus, they contend that Lucent had an "existing obligation" in addition to its "future obligation." We reject this argument. Whether Lucent could begin the process of preparing the S-3 immediately, having received "all relevant information," or one month after the signing of the Agreement, the statements on which the Herrmanns rely concern future actions. Accordingly, the district court correctly concluded that the Herrmanns are stating a claim under article 581-33 for an untrue promise to do a future act, as opposed to an untrue statement of existing material fact.

---

[2]The Herrmanns also contend that they alleged that Lucent sold a security by means of an omission to state a material fact that is necessary to make the statement not misleading. This was not urged, however, until their reply brief, which stated, in a conclusory fashion, that "[t]he Herrmanns expressly and by reasonable inference alleged . . . misleading omissions." Indeed, in the Herrmanns' original brief, they request permission to replead their article 581-33 claim to specify Lucent's omission to state the material fact that existing circumstances made it probable that Lucent would delay registration until after disclosing disappointing earnings and acquiring Chromatis, which was necessary to make Lucent's promise of expeditious registration not misleading. We do not generally consider points presented for the first time in a reply brief. Whitehead v. Food Max of Miss., Inc. 163 F.3d 265, 270 (5th Cir. 1998). It was not until oral argument, that the Herrmanns finally pointed to paragraph 6 in the "Overview" section of their complaint, which alleged that Lucent "misled the Herrmanns, and intentionally delayed filing the S-3 until after Lucent announced disappointed earnings and its stock price dropped like a rock." Needless to say, we do not generally consider points raised for the first time at oral argument. Id. Accordingly, we conclude that the Herrmans have waived any contention that they alleged that Lucent made misleading omissions.

13

The Herrmanns claim, thus, raises the question of whether article 581-33's "untrue statement of material fact" language enco mpasses an untrue promise of future action. The Texas Supreme Court has not addressed this issue. The only case cited by either the parties or the district court as to whether article 581-33 creates liability for a false promise of future performance in connection with securities does not bode favorably. In Ferguson v. Williams, the Austin Court of Appeals held that the rule that a promise of future performance will constitute fraud if it is made without intent to perform and with the intent, design, and purpose of deceiving is applicable to common law fraud and, thus, would not be applicable to a case dealing solely with article 581-33. 670 S.W.2d 327, 331-32 (Tex. App. 1984).

Even if we assume, as the district court appears to do, that a claim for an untrue promise of future action is cognizable under article 581-33, the district court's dismissal of the Herrmanns' claim was proper because such a claim would require proof of fraudulent intent, and the Herrmanns expressly disavowed this essential element in their complaint. This Court has previously recognized that unlike a common law fraud cause of action,[3] an article 581-33 claim does not require scienter–i.e., proof that the speaker knew that the representation was false, or made it without regard to its truth or falsity. Wood v. Combustion Eng'g, Inc., 643 F.2d 339, 345 (5th Cir. 1981). While Lucent does not dispute that article 581-33 liability for an untrue statement of an existing material fact or an omission to state a material fact does not require proof of scienter, Lucent argues that fraudulent intent is an element of a claim based on an allegation of an untrue promise of future

---

[3]Under Texas law, the elements of a fraud cause of action are: (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result. E.g., Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W2d 41, 47 (Tex. 1998).

14

performance.  We have not found, nor have any of the parties suggested, any decision in which the Texas Supreme Court has addressed whether fraudulent intent is an element of a claim under article 581-33 based on an untrue promise of future performance.  We must therefore make an Erie guess as to how that court would decide yet another issue.  In doing so, we may refer to the district court's ruling in this case.  Hill, 906 F.2d at 207 (5th Cir. 1990).  As the district court recognized, "[b]ecause of the obvious similarities between the TSA and the federal securities acts, Texas courts look to decisions of the federal courts to aid in the interpretation of the TSA."  Quest Med., Inc. v. Apprill, 90 F.3d 1080, 1091 n.16 (5t h Cir. 1996).  Accordingly, it is persuasive that we have held, in the context of the federal securities laws, that predictive statements "are actionable only if they were false when made."  Shushany v. Allwaste, Inc., 992 F.2d 517, 524 (5th Cir. 1993).  As we observed in Isquith v. Middle South Utilities:

> [W]hen necessary, courts have readily conceded that predictions may be regarded as "facts" within the meaning of the antifraud provisions of the securities laws.... Most often, whether liability is imposed depends on whether the predictive statement was "false" when made. The answer to this inquiry, however, does not turn on whether the prediction in fact proved to be wrong; instead, falsity is determined by examining the nature of the prediction--with emphasis on whether the prediction suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis.

847 F.2d 186, 203-04 (5th Cir. 1988).  Further, under Texas law, a promise of future performance constitutes actionable fraud only if "the promise was made with no intention of performing at the time it was made."  Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W2d 41, 48 (Tex. 1998).  We agree with the district court's determination that *if* an article 581-33 claim were to be based on an untrue promise of future performance, fraudulent intent would be required.  Because the Herrmanns did not allege that Lucent did not intend to perform its contractual

15

obligations to use its "reasonable best efforts" at the time it signed the Agreement, but expressly disavowed an allegation of fraud, we conclude that the district court correctly dismissed the Herrmanns' TSA claim.

IV.     Texas Business and Commerce Code

The Herrmanns also maintain that the district court erred in dismissing their statutory fraud claim under section 27.01 of the Texas Business and Commerce Code ("TBCC"). The TBCC provides, in pertinent part:

> (a) Fraud in a transaction involving . . . stock in a corporation . . . consists of a
>    (1) false representation of a past or existing material fact, when the false representation is
>       (A) made to a person for the purpose of inducing that person to enter into a contract; and
>       (B) relied on by that person in entering into that contract; or
>    (2) false promise to do an act, when the false promise is
>       (A) material;
>       (B) made with the intention of not fulfilling it;
>       (C) made to a person for the purpose of inducing that person to enter into a contract; and
>       (D) relied on by that person in entering into that contract.

TEX. BUS. & COMM. CODE ANN. § 27.01(a) (Vernon Supp. 2001).

In Count 3 of their complaint, the Herrmanns plead that Lucent was liable under both prongs of section 27.01(a). First, the Herrmanns allege that "Lucent made a false representation of a past or existing material fact to the Herrmanns for the purpose of inducing them to enter into a contract, and the Herrmanns did rely on the false representation in entering into that contract." Second, the Herrmanns allege that "Lucent also falsely promised to do an act and this promise was material, made with the intention of not fulfilling it, made to the Herrmanns for the purpose of inducing them to enter into a contract, and relied on by the Herrmanns in entering into that contract."

16

The first of these assertions, the claim that Lucent was liable under section 27.01(a)(1), was dismissed under Rule 9(b) by the district court because the "Herrmann[s] completely fail[ed] to identify the necessary particulars." The Herrmanns, however, argue that they plead fraud with particularity as required under Rule 9(b).

Rule 9(b) imposes certain pleading requirements on securities fraud and other fraud claims: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." FED. R. CIV. P. 9(b). This Court interprets Rule 9(b) strictly, requiring a plaintiff pleading fraud " 'to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.' " Nathenson v. Zonagen Inc., 276 F.3d 400, 412 (5th Cir. 2001) (quoting Williams v. WMS Tech., Inc., 112 F.3d 175, 177 (5th Cir. 1997)). In briefing before this Court, the Herrmanns, citing their complaint and the Agreement, set forth their allegations of the time, place, and contents of the false representations, the identity of the person making the misrepresentation, and what Lucent obtained by making the representation. This specificity has not improved their legal position. To the contrary, having spelled out the "statements contended to be fraudulent,"[4] it is now evident that, as discussed above, the Herrmanns are complaining of alleged false promises to do an act, as opposed to false representations

---

[4]The Herrmanns point to allegations that Lucent promised (1) to "use its reasonable best efforts to prepare, file and cause [the S-3] to become effective, as promptly as practicable" and "to take or cause to be taken all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective in the most expeditious manner practicable, the transactions contemplated by this Agreement including (i) [registering the stock for public resale]" and (2) that its best efforts would be "prompt, substantial and persistent efforts as a prudent Person desirous of achieving a result would use in similar circumstances."

17

of an existing material fact. Thus, we conclude that the district court correctly dismissed the Herrmanns' securities fraud claim under section 27.01(a)(1).

With regard to the Herrmanns' second assertion, the claim based on section 27.01(a)(2), the district court acknowledged that the Herrmanns specified alleged false promises concerning acts to be taken after the June 16th closing. Nevertheless, the district court dismissed the claim under Rule 9(b), concluding that although the Herrmanns made "bare allegations that Lucent made these representations with no intention of fulfilling them," the complaint did not contain any "well pleaded allegations which, if proved, would allow a fact finder to infer that Lucent acted with requisite fraudulent intent." The Herrmanns argue, however, that their factual allegations show that Lucent's alleged representations were made with an intention of not fulfilling them.

In order to adequately plead fraudulent intent, "a plaintiff must set forth specific facts to support an inference of fraud." Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1018 (5th Cir. 1996). "Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant." Id.

In their briefs before this Court, as well as during oral arguments, the Herrmanns elaborated on Lucent's possible motives to commit securities fraud. First, they allege that Lucent's delay was motivated by a desire to combine the HTI S-3 with the Chromatis S-3 in order to avoid the distraction and expense of filing separate registration statements. For essentially the reasons set forth by the district court, this alleged motive is insignificant and fails to raise an inference of fraud. Second, the Herrmanns assert that Lucent's delay was motivated by a desire to avoid repeatedly updating its negative disclosures in registration statements. The facts alleged in the complaint,

18

however, do not show such motive. Thus, this Court will not consider whether this motive is sufficient to raise an inference of fraud. Third, the Herrmanns suggest that Lucent's delay was motivated by a desire to not disclose its bad financial news until after it acquired HTI and Chromatis. The Herrmanns contend that this third motive was alleged in the complaint, pointing to allegations that Lucent "intentionally delayed filing the S-3 until after Lucent announced disappointed earnings [on July 20, 2000] and its stock price dropped like a rock"; that two weeks before Lucent acquired HTI, it announced that it soon would acquire Chromatis; that Lucent acquired HTI on June 16, 2000 for stock then worth approximately $438 million; and that Lucent acquired Chromatis on June 27, 2000, eleven days after the HTI acquisition, for stock then worth over $4 billion. Even assuming that the this third motive is sufficient, we find that these factual allegations fail to show such a motive on the part of Lucent.

Because Lucent's motive to commit securities fraud is not readily apparent, the Herrmanns face the more stringent burden of pleading fraudulent intent by "identifying circumstances that indicate conscious behavior on the part of the defendant[]." Melder v. Morris, 27 F.3d 1097, 1104 (5th Cir. 1994) (internal quotations and citation omitted). Although the Herrmanns purport to set out circumstances indicating Lucent's conscious behavior, they only point to allegations that Lucent breached its obligations under the Agreement, which are inadequate, standing alone, to support an inference of fraudulent intent. Considering all of the allegations in their complaint, we find that the Herrmanns have failed to set forth specific facts sufficient to indicate conscious behavior on the part of Lucent. Because we conclude that the Herrmanns have failed to adequately plead fraudulent intent under Rule 9(b), we hold that the district court did not err in dismissing their securities fraud claim for failure to plead fraud with particularity.

19

V.    Leave to Amend

The Herrmanns' argue in the alternative that the district court abused its discretion in denying them leave to amend their complaint to correct any deficiency. The sum of the Herrmanns' request for leave to amend was the following footnote at the end of their response to the motion to dismiss: "The Herrmanns' pleadings are more than sufficient to withstand Lucent's motion to dismiss. If the Court disagrees, the Herrmanns respectfully request that the Court treat Lucent's motion as a motion for a more definite statement and give the Herrmanns an opportunity to replead."

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely granted when justice so requires." FED. R. CIV. P. 15(a). Rule 15(a) "evinces a bias in favor of granting leave to amend." Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 598 (5th Cir. 1981). In sum, the district court must have a "substantial reason" to deny a request for leave to amend. Id. Toward that end, the district court may consider factors such as whether there has been "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." Jacobsen v. Osborne, 133 F.3d 315, 318 (5th Cir. 1998).

The district court denied the Herrmanns' request for leave to amend, concluding that "[a]lthough plaintiffs should ordinarily be offered an opportunity to amend if it appears that a more carefully drafted complaint might state claims upon which relief could be granted, that course need not be followed here since plaintiffs have already twice amended their complaint." (internal citations omitted). We perceive no abuse of discretion in this reasoning. Cf. Price v. Pinnacle Brands Inc. 138 F.3d 602, 608 (5th Cir. 1998) (holding that denial of leave to amend a complaint asserting a civil claim under the Racketeer Influenced and Corrupt Organizations Act (RICO) to permit correction

20

of a deficiency was not an abuse of discretion when the plaintiffs had three opportunities to articulate their damage theory adequately–the complaint, the RICO case statement, the brief in response to the motion to dismiss–and failed to do so, making it unfair to subject defendant to further costs of litigation); Jackquez v. Procunier, 801 F.2d 789, 793 (5th Cir. 1986) ("At some point a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit."). The Herrmanns have already filed an original complaint and two amended complaints, each alleging claims for breach of contract and violations of article 581-33 of the TSA and section 27.01 of the TBCC. The Herrmanns were given ample opportunity to plead their statutory claims. Under these circumstances, we conclude that the district court did not abuse its discretion in denying leave to amend.

CONCLUSION

For the reasons discussed above, we REVERSE the district court's 12(b)(6) dismissal of the Herrmanns' breach of contract claim, and REMAND for further proceedings. In all other respects, we AFFIRM the district court's rulings.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.