# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 20, 2013

No. 12-30661

Lyle W. Cayce
Clerk

HAROLD H. TEMPLE,

Plaintiff-Appellant

v.

MARSHA PAUL MCCALL; MAJORIE RYALS PAUL; NED WALTER
JENKINS, III; DAVID PAUL JENKINS; LETHA BROWN TAYLOR,

Defendants-Appellees

Appeal from the United States District Court
for the Western District of Louisiana

Before KING, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

This appeal arises out of a dispute over a mineral servitude located in Sabine Parish, Lousiana. Appellant Harold Temple brought this declaratory judgment action, alleging that he is the owner of certain mineral rights in the land previously sold to the Sabine River Authority. Temple claims that the mineral rights were conveyed via credit deed in 1969 to his predecessors-in-interest. Appellees Marsha McCall et al. ("McCall") counter that, since the language used in the deed did not expressly convey the mineral rights along with the surface-area rights, those mineral rights remained reserved. McCall's argument is supported by expert testimony on the common interpretation of

No. 12-30661

language used in conveyance deeds. As there is no competing indication that the mineral rights were conveyed to Temple's predecessors-in-interest, we hold that McCall owns the disputed mineral rights. The district court's judgment is AFFIRMED.

## FACTS AND PROCEEDINGS

The 40-acre tract of land at issue was originally owned by Elizabeth Paul Jenkins and T.J. Paul, Jr. On April 30, 1965, Jenkins and Paul conveyed 35.89 acres of the 40-acre tract to the Sabine River Authority ("SRA") for the creation of the Toledo Bend Lake, but reserved the mineral rights in the land in perpetuity as allowed by statute. On September 4, 1965, Jenkins transferred to Paul all of her interest in the originally owned property, including the mineral rights (the "Jenkins-Paul Deed").

On April 8, 1969, Paul sold a portion of the property via credit deed to R.V. Woods (the "Paul-Woods Deed"). There is no dispute that, through this transaction, Paul sold Woods some of the surface-area property that *had not* been conveyed to the SRA as well as the mineral rights underlying that property. The parties disagree, however, as to whether Paul also sold Woods his interest in the mineral rights underlying the surface-area property that *had* been conveyed to the SRA. The deed noted that Paul:

> Grant[ed], Bargain[ed], S[old], Convey[ed] and Deliver[ed] with full guaranty of title, and with complete transfer and subrogation of all rights and actions of warranty against all former proprietors of the property presently conveyed unto R.V. Woods . . . the following described property:
>
> All that part [within the given coordinates that comprise the original 40-acre tract] lying West and South of the Public Road, LESS portion sold to Sabine River Authority.

No. 12-30661

The clause reading "[a]ll that part . . . lying West and South of the Public Road" refers to a 15.5-acre tract carved out of the original 40-acre tract. The clause reading "LESS portion sold to the Sabine River Authority" refers to a 14.982-acre tract, the surface area which had been conveyed to the SRA. The parties dispute whether the "LESS" clause excluded from sale only the surface-area rights in this 14.982-acre tract, clearly belonging to the SRA, or also the mineral rights underlying that land (the "disputed mineral rights").

In 2000, Temple purchased the property from Woods. The cash-sale deed (the "Woods-Temple Deed") used language identical to that used in the Paul-Woods Deed to describe the rights and property conveyed by Woods to Temple.

In 2001 and 2004, Temple granted mineral leases over the surface-area property that he purchased from Woods, while Paul's heirs, including McCall, granted leases of the disputed mineral rights to producer Phillips Petroleum. In 2008, McCall granted another lease of those mineral rights. Upon the development of a natural gas formation in 2008, however, mineral leasing activity in the area increased substantially. In September 2010, Temple brought suit against McCall in the Eastern District of Louisiana, claiming that he owned the disputed mineral rights pursuant to the language in the Paul-Woods Deed and the Woods-Temple Deed. After a bench trial on the merits, the district court entered judgment against Temple, finding that McCall owns the mineral rights. Temple appeals.

## STANDARD OF REVIEW

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000). As this

No. 12-30661

court exercises diversity jurisdiction over this case, it applies the substantive law of Louisiana. *See id.*

## DISCUSSION

Temple raises three primary issues on appeal: (1) whether the language in the conveyance deeds adequately reserved the disputed mineral rights for Paul's heirs, namely McCall; (2) whether the district court was *Erie*-bound by the Court of Appeal of Louisiana's decision in *Sheridan v. Cassel*, 70 So. 3d 89 (La. Ct. App. 2011), which held that mineral rights must be expressly reserved in a conveyance of land; and (3) whether we should certify the question of Louisiana law to the Louisiana Supreme Court. We affirm the district court's determinations on the first two issues and decline to certify this question to the Louisiana Supreme Court.

### I.

Louisiana law states that mineral rights are "real rights," LA. REV. STAT. ANN. § 31:16, that can be conveyed, reserved, or leased by the landowner, LA. REV. STAT. ANN. § 31:15. In other words, "ownership of 'land' and ownership of mineral rights in such land are not necessarily one and the same." *Plaquemines Parish Gov't v. State*, 826 So. 2d 14, 20 (La. Ct. App. 2002). Mineral rights can be detached from the surface area from which they are derived. *See Mobil Oil Corp. v. Brennan*, 385 F.2d 951, 953–54 (5th Cir. 1967) (holding that mineral rights remain attached to the surface area "unless expressly detached therefrom by the surface owner"). McCall's predecessors executed such a detachment in 1965, when Jenkins and Paul conveyed part of their surface-area property to the SRA, but reserved the mineral rights in that property.

Neither party disputes that Jenkins and Paul adequately reserved the disputed mineral rights in 1965. What Temple disputes is McCall's contention that those mineral rights continued to be reserved in subsequent conveyances.

4

No. 12-30661

According to Temple, the "LESS" language in the 1969 and 2000 conveyance deeds only meant that he would not receive the surface-area property that was sold to the SRA. He contends that this "LESS" language did not carve out the mineral rights underlying that land. Since these disputed mineral rights were not explicitly described in the conveyance deeds, McCall's predecessors-in-interest could not have expressly reserved the mineral rights via the "LESS" language. Under this theory, with each conveyance of the property, the mineral rights were also transferred by the vendors to the new purchasers.

We look to Louisiana law to assess the parties' arguments regarding the language used in the conveyance deeds. Under Louisiana law, "[o]wnership of immovable property (which includes mineral rights) in dispute must be determined from the public records," or in this case, the conveyance deeds. *Texaco, Inc. v. Newton & Rosa Smith Charitable Trust*, 471 So. 2d 877, 882 (La. Ct. App. 1985). The language used in the 1969 and 2000 conveyance deeds, however, is ambiguous. There is no mention of whether or not the disputed mineral rights are included in these conveyances, and there is no indication of whether the description of the property excluded from sale is intended to encompass only the surface-area property owned by the SRA, or also the mineral rights underlying that property.

When a contract is "not specific in its wording," Louisiana courts have looked to "the usual and customary manner of fulfilling like contracts" as "persuasive [evidence of] the intention of the parties." *Par-Co Drilling, Inc. v. Franks Petroleum Inc.*, 360 So. 2d 642, 644 (La. Ct. App. 1978); *see also Frischhertz Elec. Co., Inc. v. Hous. Auth. of New Orleans*, 534 So. 2d 1310, 1313 (La. Ct. App. 1988) (considering the "customary manner of fulfilling like contracts . . . to interpret the meaning of the ambiguous terms of the contract" (citing LA. CIV. CODE ANN. art. 2053)). The use of expert testimony is appropriate where, for example, a phrase in a contract is ambiguous and a court

5

seeks to determine "whether there is a received usage in the trade which would shed light on its meaning." *Jefferson Disposal Co., Inc. v. Jefferson Parish*, 459 So. 2d 639, 642 (La. Ct. App. 1984).

At trial, McCall's land-conveyancing expert testified that the type of property description used in the 1969 and 2000 conveyance deeds often depicts the "surface area of a piece of property" being conveyed in situations where the property consists of jagged edges and is not a perfect square. In the expert's opinion, the use of language, such as "southwest of Section 28 less and except that part already sold to Mr. Jones"—which is similar to the language at issue here—is "the preferred way" of "describing a conveyance to a new buyer . . . if [the parties are not] going to have the property surveyed." This is because the seller must ensure that he is conveying "all of the surface area in that subsection except what he has already sold to somebody else." Furthermore, the expert testified that, in his opinion, McCall's predecessors-in-interest did not transfer or intend to transfer the disputed mineral rights to subsequent purchasers via the conveyance deeds. The expert opined that the sellers likely would have used words such as "oil, gas, [or] minerals" or would have "included a specific reference to the servitude" if they intended to transfer the disputed mineral rights.

We accept as persuasive the expert's opinion on the correct interpretation of the language in the conveyance deeds. Specifically, the expert's testimony indicates that the "all that part" language describes the surface area being conveyed, but does not encompass the disputed mineral rights as well. When the conveyance deeds' ambiguous language is viewed in light of the customary interpretation of such language, as clarified by expert testimony, we are led to conclude that the disputed mineral rights were never transferred to Temple's predecessors-in-interest.

No. 12-30661

Our conclusion is in alignment with the case relied upon most heavily by Temple in support of his argument, *Sheridan v. Cassel*, 70 So. 3d 89.  In *Sheridan*, Appellee Tommy Cassel sold 80 acres of property to his sister, Gertrude Cassel Ray, without reserving any mineral rights in the property. According to the 1969 Cash Sale Deed, Cassel:

> Grant[ed], Bargain[ed], S[old], Convey[ed] and Deliver[ed] with full guaranty of title, and with complete transfer and subrogation of all rights and actions of warranty against all former proprietors of the property herein conveyed unto Gertrude Cassel Ray . . . the following described property:
> . . .
>> [The property], *containing 80 acres*, more or less, together with all buildings and improvements thereon.

*Id.* at 94 (Cooks, J., dissenting) (emphasis added).  However, prior to that sale, Cassel conveyed a portion of the surface area of that property (approximately 3 acres) to the Sabine River Authority and reserved the mineral rights in that property for himself.  Thus, at the time of his sale to Ray, Cassel owned approximately 77 surface area acres and 3 mineral acres of property.

Upon Ray's death, Cassel re-acquired the aforementioned property and then sold all of his interest in the property to Appellant Carolyn Sheridan. According to the Cash Sale Deed, Cassel conveyed to Sheridan:

> [A]ll of his interest . . . in and to [the property], less a 3.27 acre tract in the northwest corner, Sabine Parish, Louisiana, containing 77.0 acres, more or less.

*Id.* at 94–95 (Cooks, J., dissenting).  On the same date, in a document entitled "Conveyance and Assignment of Interest in Estate" (the "Conveyance and Assignment"), Cassel further described the property conveyed to Sheridan as:

> [A]ll of my *right, title, claim, and interest*, real and personal, in and to the Estate of [Ray] including, but not limited to all real property and all personal property of said estate . . . including . . . all other properties and assets of said estate,

No. 12-30661

wheresoever located, and of whatsoever kind and nature, and all rights of said estate of every kind and character.

*Id.* at 95 (Cooks, J., dissenting) (emphasis added) (first alteration in original).

Two decades after she acquired the property, Sheridan filed a petitory action against Cassel, asking for a judgment declaring her to be the owner of the mineral rights encumbering the property sold to the SRA. Sheridan alleged that, pursuant to the Cash Sale Deed, Cassel conveyed all of his interest in the 80-acre estate to Ray, including the mineral rights. Thus, when he re-acquired those rights from Ray and sold them to Sheridan, he conveyed all of his interest in the 80-acre estate to Sheridan. The Louisiana trial court agreed and granted summary judgment in favor of Sheridan, finding that:

[I]n the April 5, 1969 cash sale deed to [Ray], [Cassel] conveyed 'all rights' to the subject 80 acres without reservation of the mineral rights he possessed from the sale of the subject 3.27 acres to the Sabine River Authority . . . Thus, [Cassel] transferred 76.73 surface acres and 80 mineral acres to [Ray] that remained with her until her death.

*Id.* at 91 (quoting the trial court's order). The Court of Appeal of Louisiana affirmed the trial court's finding.

In comparing his claim to that in *Sheridan*, Temple focuses singularly on the "all rights" language used by the conveyance deeds in both cases. *See Sheridan*, 70 So. 3d at 93. Temple contends that, like Sheridan, Woods conveyed all of his rights to the described area, less the surface area previously sold to the SRA. However, Temple's reliance on the "all rights" language is misplaced. At Temple's trial, the land conveyancing expert testified that the "all rights" language refers to "rights and actions of warranty . . . not any rights . . . to the property that's later described in the non-preprinted form or portion of the deed." The district court was correct in noting that the "all rights" language used here and in *Sheridan* does not guide our analysis. *See Temple v. McCall*, No. 10-cv-1415, 2012 WL 1934013, at *4 (W.D. La. May 29, 2012).

No. 12-30661

*Sheridan* is also distinguishable on alternative grounds. In *Sheridan*, the state court determined that, through the Conveyance and Assignment, Cassel conveyed "all of [his] right, title, claim, and interest, real and personal, in and to" *all eighty acres* of the property, including the three mineral acres that Cassel had previously sold to the SRA. *Sheridan*, 70 So. 2d at 93. In contrast, the description of the property conveyed here did not include the surface-area property sold to the SRA.

In failing to acknowledge this discrepancy, Temple essentially ignores that, in *Sheridan*, the Conveyance and Assignment clarified the boundaries of the property to which Sheridan acquired rights. *See id.* The fact that the Conveyance and Assignment explicitly described the 80-acre tract of land is compelling evidence that the conveyance included both the 77 acres of surface area and the remaining 3 acres of mineral rights. Temple has not pointed to any analogous instrument that suggests that the land conveyed to him includes the disputed mineral rights. As the descriptions of the property conveyed and the instrument used to convey that property are critical to the interpretation of the 1969 and 2000 conveyance deeds, we hold that *Sheridan* is not controlling.

## II.

When evaluating issues of state law, federal courts "look to the final decisions of that state's highest court." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010). "In the absence of such a decision, '[federal courts] must make an *Erie* guess and determine, in [their] best judgment, how [the supreme court of that state] would resolve the issue if presented with the same case.'" *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007)). "In making an *Erie* guess, [federal courts] defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." *Mem'l Hermann*

*Healthcare Sys. Inc. v. Eurocopter Deutschland*, 524 F.3d 676, 678 (5th Cir. 2008) (quoting *Herrmann Holdings Ltd. v. Lucent Tech. Inc.*, 302 F.3d 552, 558 (5th Cir. 2002)).

Temple alleges that, since there are no Louisiana Supreme Court cases on point and no "other persuasive data," *id.*, that would counsel against deference to *Sheridan*, the district court was bound by the state appellate court's decision.[1] Temple's argument rests in large part on his assertion that the district court did not identify any other persuasive data that would justify its deviation from the holding in *Sheridan*.[2] However, since the facts in *Sheridan* are distinguishable, we are not bound by its holding nor required to identify other persuasive data in determining that Woods did not convey the disputed mineral rights to Temple. *Cf. Birmingham Fire Ins. Co. of Pa. v. Winegardner & Hammons, Inc.*, 714 F.2d 548, 550 (5th Cir. 1983) (according less deference to the state appellate court opinion where "specific tangible circumstances [indicated] that the supreme court of the state would hold differently from the lower state court"). Our *Erie* guess is that the Supreme Court of Louisiana would use the expert's testimony as guidance in interpreting the conveyance deeds, and ultimately reach the same

---

[1] "Other persuasive data" that may justify deviation from the appellate court's holding could consist of, among other things, "the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Chaney*, 595 F.3d at 229 (quoting *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 483 (5th Cir.2008)).

[2] Temple also maintains that the district court should not have relied on the dissent in *Sheridan* as support for its disposition. While this court has expressly refused to "accord a solo dissenting opinion any weight as an expression of Louisiana law," *Louque v. Allstate Ins. Co.*, 314 F.3d 776, 781 (5th Cir. 2002), it is not clear that the district court relied solely on the dissenting opinion in concluding that Woods reserved the disputed mineral rights in the Woods-Temple Deed. Instead, it appears that the district court referred primarily to the *Sheridan* dissent to obtain a more detailed description of the facts and to understand the context of the decision. *See Temple*, 2012 WL 1934013, at *3. Additionally, the district court did not need to rely on the *Sheridan* dissent to justify its findings since it noted that the facts in *Sheridan* were distinguishable. *See id.* at *4 (observing that, unlike the language used in the conveyance deeds, the language used in the *Sheridan* deed "encompass[es] any mineral rights the seller had in connection with the described tract").

No. 12-30661

conclusion that we do—that the disputed mineral rights were not conveyed to Temple's predecessors-in-interest.

## III.

Temple alternatively requests that we certify the determinative question of Louisiana law to the Louisiana Supreme Court. We may certify a determinative question of Louisiana law to the Louisiana Supreme Court when that question has not been resolved by "clear controlling precedent" of that court. LA. REV. STAT. ANN. § 13:72.1; *Jesco Constr. Corp. v. NationsBank Corp.*, 278 F.3d 444, 448 (5th Cir. 2001). However, "[a]s a general proposition, we [are] chary about certifying questions of law absent a compelling reason to do so; the availability of certification is such an important resource to this court that we will not risk its continued availability by going to that well too often." *Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1247 (5th Cir. 1997). Thus, "absent genuinely unsettled matters of state law, [this court has been] reluctant to certify." *Id.*

In requesting certification to the Louisiana Supreme Court, Temple not only failed to formulate a certifiable question of law, but also rested his argument on the erroneous assumption that an affirmance of the district court's decision would create precedent at odds with the Louisiana Court of Appeal's decision in *Sheridan*. For the reasons discussed above, an affirmance of the district court's decision would not be at odds with the appellate court's holding in *Sheridan*. Temple's request for certification to the Louisiana Supreme Court is therefore denied.

## CONCLUSION

Although Temple claims that the language used in the Deeds encompassed the disputed mineral rights, his argument is belied by expert testimony on the common interpretation of such language in land-conveyance transactions. We

No. 12-30661

agree with the district court that the language used in the conveyance deeds does not demonstrate that the disputed mineral rights were transferred to Temple's predecessors-in-interest. Thus, McCall owns the disputed mineral rights.  The judgment of the district court is AFFIRMED.