KERS & COMPANY, a Kansas general partnership, Plaintiff,

v.

ATC COMMUNICATIONS GROUP, INC., a Delaware corporation, Defendant.

No. 97–1222–JTM.

United States District Court, D. Kansas.

June 24, 1998.

**1268**

James A. Walker, Jeffrey D. Leonard, Triplett, Woolf & Garretson, LLC Wichita, KS, James P. Cusick, Wendy Bloom, Kirkland & Ellis, Chicago, IL, for Plaintiff.

William Robert Martin, Roger E. McClellan, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, Walter G. Pettey, III, Stephen G. Gleboff, Catherine C. Theisen, Hughes & Luce, L.L.P., Dallas, TX, for Defendant.

## MEMORANDUM ORDER

MARTEN, District Judge.

The present action arises from a stock option agreement granted by defendant ATC as compensation for the efforts of the late Bobby Vickers, who had helped in establishing ATC's business. At Vickers's request, the option was actually given to the plaintiff KERS & Company, a partnership which holds the title to securities on behalf of trusts established by Vickers. Vickers died in 1995. KERS alleges here that ATC violated the provisions of the stock option agreement by failing, following receipt of a notice that KERS was exercising the option, to register the optioned stock in a timely manner.

KERS has moved for summary judgment on the issue of damages and liability. Several other motions are also before the court on evidentiary issues at trial, which the court finds it will be unnecessary to address. For the reasons identified herein, the court will grant the plaintiff's motion for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The moving party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985) The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts

showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

With a few exceptions, the facts in the case are not the subject of significant dispute. Defendant ATC fails to respond in its response to most of the factual averments advanced by KERS. Moreover, contrary to D.Kan. Rule 56.1, ATC offers not a statement of facts "numbered by paragraph [which] shall refer with particularity to those portions of the record upon which the opposing party relies [and stating] the number of movant's fact that is disputed." Instead, ATC's statement of facts (Resp. at 9–14) is simply a meandering narrative which adds little to the relevant facts before the court. KERS's statement of the facts is either wholly uncontroverted, or, in a minority of instances, subject to mere contrary assertions by ATC which, as will be discussed further below, is not supported in the evidence.

KERS & Company is a Kansas general partnership organized to take securities on behalf of the Vickers Trusts. KERS's partners also serve as trustees of the Vickers Trusts. The trustees of the Vickers Trusts manage the assets of the trusts and make investment decisions regarding trust assets; these decisions are carried out by KERS through the trust administrator, Thomas Triplett. Defendant ATC Communications, Inc. is a Delaware corporation with a principal place of business in Dallas, Texas. ATC provides outsourced telecommunications-based marketing, customer service and call center management services.

On December 21, 1994, KERS entered into a Stock Option Agreement and Registration Rights Agreement with NRP Inc. (ATC's predecessor)[1] on December 21, 1994. The stock option was for a ten-year period, and granted KERS a "nonqualified stock option to acquire up to a total of to 225,000 shares" of ATC common stock at a price of $1.00 per share. (Plf.¶ 6).

The Registration Rights Agreement was for the same period, and set forth the rights and obligations of the parties with respect to registration of the shares subject to the option. Under this agreement, KERS was given "Demand Registration Rights" which included the right, which could be exercised "[a]t any time," to submit a written demand that ATC file a "registration statement" with the SEC for the 225,000 shares.

Upon receiving such a demand, ATC was required to "as soon as practicable, use its best efforts to effect the registration of all Registrable Securities that the Company has been so requested to register." (Plf.¶ 8). This registration would be "on such appropriate registration form as will be selected" by ATC, which was given the option to "postpone the filing of such a registration statement for any reason [but only] for a period of up to ninety (90) days from the date of its receipt of a request from KERS." (Plf. ¶ 9; Rights Agr. § 2.2(b)).

The agreement provided that Delaware law controlled. The registration agreement also restricted purported oral modifications or waiver. Under Art. VII, § 7.3, the agreement provided that it "may not be amended or supplemented except by a writing signed by the Company and the Optionee." (Plf.¶ 10). Section 7.7 of the same Article provided: "Any waiver of any such right or remedy [accorded under the agreement] by any party must be in writing and signed by

---

1. The succession occurred following a name change effective April 30, 1996.

the party against which such waiver is sought to be enforced." (Id.)

In the summer of 1996, Triplett asked for a personal meeting with ATC to discuss whether ATC had any interest in acquiring the stock subject to the option or in buying KERS's minority interest in a related non-public company controlled by ATC. With the assistance of Paul Bass, an executive of First Southwest Company in Dallas, a meeting took place at ATC's Dallas offices on June 24, 1996. Bass was a friend of Jess Turner and Darryl Pounds of ATC, as well as a friend of the late Bobby Vickers. Bass has never been an agent of either KERS or ATC, but attempted to "remain more of a facilitator." (Plf.¶ 16). ATC's controller Jerry Sims knew Bass had acted as a "go-between," but knew he was not and had never held himself out as an agent of KERS. (Plf. ¶ 16, Sims Dep. at 310).

ATC did not ask at the meeting for any alteration or delay in its registration obligation under the agreement. (Plf.¶ 14). Defendant attempts to controvert this fact, asserting the parties reached a "binding agreement" on the issue at the meeting. This assertion has no factual support. The cited portion of Sims's deposition establishes only that the issue of exercising the option was raised, after which there was some "general [ ] acknowledg[ment]" and "general agreement" about "the best time to file a registration statement," (Sims Dep. at 60–61). However, nothing suggests or supports the claim of a binding agreement limiting the earlier, explicitly provided rights under the Registration Agreement.

At some point after this meeting, KERS decided to request registration of the stock. On July 11, Triplett sent a registration demand letter to Sims, the ATC employee with direct responsibility for responding to the demand, by United States mail. The letter provided:

> Pursuant to the provisions of the Registration Rights Agreement, and particularly with regard to Article II, KERS & Co. hereby requests that the Company affect [sic] registration of the entire amount of the shares of commons stock available for exercise pursuant to the option granted in

the Stock Option Agreement dated December 21, 1994.

(Plf. ¶ 18; Sims Dep.Exh. 7).

Sims received the letter on or about July 13, 1996. Under § 2.2(b) of the Rights Registration Agreement, ATC therefore had the discretion to delay until October 11, 1996 filing the registration statement with SEC. Sims, however, failed to make any plan as to what he was going to do in response to the demand.

Ultimately, ATC would file a Form S–3 statement to register KERS's shares. The Form S–3 is an abbreviated or short form registration statement which incorporates by reference previously filed financial documents. The S–3 filed by ATC incorporated by reference (1) the company's Form 10–K for the fiscal year ending June 30, 1996 which had been filed on September 30, and (2) an audit of the company by Price Waterhouse attached to the 10–K Form. (Plf.¶ 23–24).

With appropriate planning and assuming the incorporated documents are on file with the SEC, the process of preparing and filing a Form S–3 registration statement need not take more than a few days. According to Paul Bass, the normal procedure with a Form S–3 is to "fill in the blanks" and have it "ready to go" soon after the filing of a Form 10–K. Similarly, Price Waterhouse could have issued a standardized consent letter for the reference to its audit in the Form S–3 within a day or two of any request.

In its response, ATC argues that Sims had agreed with Triplett for an October 31 target date for the registration. This assertion is not supported by the facts. Sims indicates he informed Bass, but explicitly states he can't remember any other conversation with either Bass or Triplett with respect to a "target date" (Sims Dep. at 262).

Sims spoke often with Bass in September and October of 1996. ATC's phone records indicate that Bass left messages for Sims or other executives on October 2 and October 4, and twice on both October 3 and 9. Sims also admits receiving a telephone call from Triplett, who was "rather agitated" about the delay in processing the registration.

Sims concedes that, if he had contacted ATC's outside counsel, auditors, and board of directors earlier than he actually did, ATC could have finalized the S–3 registration statement within a few days of the September 30 filing of the company's Form 10–K. He also admitted that he never reviewed the Registration Rights Agreement, although nothing prevented him from doing so.

Instead, ATC's first step in response to Triplett's July 11 letter was in early October, when Sims contacted the company's outside counsel, Hughes & Luce, to ask for a draft of the registration statement. Sims did not ask Price Waterhouse for a consent letter until nearly a month after the Form 10–K was filed. The consent letter was additionally delayed when ATC delayed in sending standard management representation letters.

ATC's expert, David Oden, testified he did not have an opinion whether the company used its best efforts to register KERS's optioned stock. According to Schneider (plaintiff's expert), ATC could have filed the Form S–3 by October 11, 1996 without any undue or unusual effort or expense.

Ultimately, Price Waterhouse issued its consent letter on November 8, 1996, and ATC filed its S–3 registration the same day. The SEC issued a notice it would not conduct a review of the statement, which then became effective 13 days after filing, on November 21. On October 24 (thirteen days after the filing deadline of October 11, 1996), ATC common stock closed at $24 5/8. On November 21, the stock closed at $15 13/16.

If the registration had been effective on October 11, KERS trustees have stated the company would have immediately exercised its option and sold all 225,000 shares. Indeed, the KERS trustees explicitly agreed in the late September meeting that the stock would be sold "immediately" after registration. (Plf.¶ 42).

According to Gordon, KERS could have begun selling the shares on October 24, and sold all the shares by the next day without disrupting the market. In contrast, if it had begun selling its shares on November 21, it would have taken eight trading days to complete the sale due to the state of the market, and KERS would have received an average price of $15.7088 per share. Therefore, KERS lost $2,069,235 which it would have gained but for the breach.

The parties agree that, under the terms of the agree that, Delaware law controls.

### Conclusions of Law

The court finds that the uncontroverted facts established that ATC violated its obligation under the Rights Registration Agreement. In its response, ATC argues mainly that the KERS motion is inappropriate, and no breach occurred, because § 2.2 of the Agreement does not create a "deadline" of 90 days, but simply a postponement clause. ATC also offers the opinion testimony of securities lawyer David Oden that the 90–day provision gave "ATC the right to postpone the entire process of effecting registration." (Resp. at 21).

ATC's argument that no breach occurred is inconsistent with the facts before the court. Although § 2.2 clearly gives ATC the right to delay or postpone the filing of the registration statement for 90 days "in its sole discretion and without the consent of the Optionee," the Agreement nonetheless requires that ATC "[a]fter receipt of a [registration] request ... as soon as practicable, use its best efforts to effect the registration of all Registrable securities." (Rights Agreement at § 2.1). Thus, under the plain language of the agreement, ATC is given the right to postpone filing for 90 days after receipt of a written demand, but it is still subject to an ongoing obligation to use its best efforts to effect the registration. Having delayed longer than 90–days in registering the shares, ATC can show compliance with the agreement only if it exercised its best efforts in the process.

Strikingly, the response fails to identify any factual basis which would permit a rational finder of fact to find that it did use its "best efforts" in registering the optioned shares. To the contrary, KERS's evidence that the effort necessary to register the shares was not significant, and that ATC failed to take even minimal efforts to timely obtain registration, stand uncontroverted.

In the same vein, ATC cannot alter the plain language of the agreement through the use of extrinsic evidence such as Oden's testi-

mony. *Eagle Industr. v. DeVilbiss Health Care,* 702 A.2d 1228, 1232 (Del.1997). The unambiguous language of § 2.2 of the agreement provides that after receiving written notice, ATC may delay "the filing of such a registration statement ... for a period of up to ninety (90) days." The suggestion that the provision allows ATC to delay not simply the filing of the statement but also to delay even commencing *the process leading to the ultimate filing,* flies in the face of the text of the agreement.

 ATC also suggests no breach occurred because of an agreement between ATC and KERS to delay the time frame for registration. Delaware law requires that a party seeking the refuge of a purported oral modification to a written contract must demonstrate with some degree of clarity the terms of such a modification. *Hursey Porter & Assoc's v. Bounds,* 1994 WL 762670 at *6 (Del.Super. Dec.2, 1994); *Haft v. Dart Group Corp.,* No. 93–384–SLR, 1994 WL 828326 at *12 (D.Del. Aug.17, 1994). As noted earlier, ATC cites Sims's testimony that at the June meeting there was "general agreement" at the meeting to a "time frame," under which the "best time" for registration "would be after ATC filed its form 10–K for the year ending June 30, '96."

ATC has introduced no evidence showing that such a "time frame" necessitated delay past the 90–day period. Certainly, this piling of generalization on generalization in Sims's deposition falls far short of creating a binding oral modification to obligations which were previously and clearly established in the written Rights Agreement. There is no evidence KERS either actually consented to or received any consideration for any purported modification which would extend the time for registration for filing or which would relieve ATC of its ongoing obligation to use its best efforts to achieve registration.

 ATC's arguments of acquiescence and equitable estoppel by KERS in the late registration are equally ill-founded in the record before the court. Nothing there shows any manifestation of intent or deceptive silence by KERS representatives that they were satisfied with delayed registration or that KERS was waiving its rights. Neither is there any evidence that KERS representa-

tives misrepresented to ATC its position on the requirement for timely registration. The terms of the contract relating to registration are, as noted earlier, clear and unambiguous, and were certainly independently and freely available to ATC.

Although ATC cites evidence indicating that Bass did not object to the postponement, it is also clear that neither KERS nor Bass himself ever represented that Bass had any authority to bind KERS. (Sims dep. at 311). ATC cites Sims's deposition assertion that he thought Bass was an agent of KERS. This rather overstates the evidence. Sims's deposition directly indicates that Bass's status was ambiguous, stating that Bass "had been acting in a role as—I guess it would be agent or go-between for ATC—or for KERS with ATC." (Dep. at 310). Just as importantly, ATC has presented no evidence that *KERS* did anything which would reasonably lead Sims or ATC to believe that Bass was acting as authority to bind KERS. *See Finnegan Construction Co. v. Robino–Ladd Co.,* 354 A.2d 142, 144–45 (Del.Super.1976) (holding "apparent authority can never be derived from the acts of the agent alone [but is] to be determined by indicia of authority" given by the principal).

The final set of arguments presented by the parties relates to damages. ATC argues (1) that a jury question remains as to whether KERS can show it would in fact have sold its shares in October if they had been timely registered, and (2) that ATC failed to properly mitigate its damages.

The court finds that both arguments must be rejected. As to the first, KERS has offered uncontroverted evidence both from its trustees and from minutes of the September board meeting indicating that the shares would be sold as soon as possible after registration. *See Commonwealth Associates v. Palomar Medical Tech.,* 982 F.Supp. 205, 209 (S.D.N.Y.1997) (finding damages based on price of stock at time purchaser's chief executive officer "testified without contradiction that [it] would have proceeded to sell them").

 Here, the only evidence that ATC offers to support its claim that, assuming an earlier registration of the shares with the SEC, KERS would not have sold its shares

as soon as possible in October is that it did not sell them, in fact, after the breach, in November. This would seem to be insufficient. As noted in the fact section, it is uncontroverted that the price of the ATC stock had fallen precipitously by the time ATC finally arranged for the registration. That KERS did not sell the stock in those circumstances does nothing to detract from the otherwise uncontradicted evidence that it would have done so in October, but for defendant's breach.

 KERS's assessment of damages appears appropriate. The evidence establishes that, but for the breach, KERS could and would have sold the stock by an open-market sale beginning on October 24. ATC argues that the requested amount of damages should be reduced, since KERS failed to mitigate its damages by short-selling or engaging in "put" and "call" options trading. The uncontroverted evidence submitted by KERS establishes, however, that such approaches would have exposed KERS to additional risks of loss.[2] A party seeking recovery for damages due to a breach is subject to the requirement that they have not acted unreasonably so as to increase the damages which would otherwise exist. *Handelsgesellschaft Scharfe mbH & Co. v. Krapf & Sons*, Case No. 84C–JA–11, 1985 WL 189275, at *5 (Del.Super. Sept.19, 1985) (citing 22 Am.Jur.2d Damages § 33). Such reasonable efforts at mitigation do not require a party to subject themselves to the risk of incurring additional losses. *Fisher v. First Stamford Bank & Trust*, 751 F.2d 519, 524 (2d Cir. 1984).

In sum, the court finds the plaintiff's motion for summary judgment should be granted. The court further finds that this shall include an award of damages for pre-judgment interest in the amount of $310,-099.77 (10% times amount lost through April 24, 1998), as calculated by plaintiff. Recovery for prejudgment interest is normally awarded under Delaware law for breach of contract. *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del.1992).

IT IS ACCORDINGLY ORDERED this 23rd day of June, 198, that the plaintiff's motion for summary judgement is hereby granted.

---

**2.** Plaintiff's Statements of Fact ¶¶ 47–61, relating to this issue, are wholly ignored in the defendant's response, save for the observation that mitigation is a duty and that the suggested approaches would have been "simple." (Resp. at 6–7). As noted above, the touchstone of a party's duty to mitigate is reasonableness, not simplicity.

Defendant offers no evidence to controvert plaintiff's evidence that the strategies proposed by ATC would have exposed the plaintiff to significant market risk of additional losses and required incurring additional costs and the use of substantial collateral.