259 P.3d 256 (2011)
In the Matter of the Marriage of Daniel J. FARMER, Petitioner
v.
Teresa W. FARMER, Respondent.
No. 83960-3.
Supreme Court of Washington, En Banc.
Argued January 11, 2011.
Decided September 8, 2011.
*259 Catherine Wright Smith, Valerie A. Villacin, Smith Goodfriend PS, Seattle, WA, Douglas Allen Saar, Law Office of Skinner & Saar PS, Oak Harbor, WA, for Petitioner.
Kenneth Allen Manni, Attorney at Law, Oak Harbor, WA, Gregory Mann Miller, Carney Badley Spellman PS, Seattle, WA, for Respondent.
STEPHENS, J.
¶ 1 This case involves a trial court's method of valuing stock options in a dissolution proceeding. After separating, Daniel and Teresa Farmer entered into a stipulated agreement dividing their community assets, including several thousand stock options Daniel[1] had received from his employer during the marriage. Under the terms of the agreement, Teresa could decide when to exercise her share of the stock options. Before entry of the decree of dissolution, however, Daniel fraudulently exercised all of the options. The trial court was unaware of this when it awarded Teresa half of the community stock options in the final decree. When the facts came to light, Teresa moved for relief from the dissolution decree under CR 60(b), asking the court to invoke its equitable authority to award her damages for her loss. The court assessed damages based on the present value of the stock options as calculated by Teresa's expert witness. The Court of Appeals affirmed, deferring to the trial court's equitable discretion to make Teresa whole. We affirm the Court of Appeals and hold that the trial court did not abuse its discretion in calculating damages to Teresa.

FACTS AND PROCEDURAL HISTORY
¶ 2 Daniel and Teresa were married in August 1987 and accumulated significant community assets before separating in early 2004. During the course of the marriage, Daniel was employed at PACCAR. Beginning in April 1999, Daniel received PACCAR stock options on an annual basis, each with a set price and a ten-year expiration period. By the time of the parties' separation in 2004, Daniel had received approximately 15,000 stock options. The options had expiration dates between April 27, 2009 and January 15, 2013.[2]
¶ 3 After initiating the dissolution action and engaging in over two years of discovery, Daniel and Teresa filed a stipulated agreement with the court under CR 2A (CR 2A Agreement) resolving the parenting plan, child support, and the division of community assets. The agreement contained a specific provision equally dividing the community stock options Daniel had received from PACCAR. Because the options were nontransferable, they had to remain in Daniel's possession, but the agreement granted each party the right to choose when to exercise his or her share of the options.
¶ 4 In August 2006, approximately one month after filing the CR 2A Agreement with the court, Daniel unilaterally exercised all of the community stock options, including Teresa's share. He immediately sold the stock, netting $444,664.63 after taxes and other expenses. Shortly after cashing in the options, Daniel e-mailed Teresa and attempted to persuade her to exercise her half of the stock options, which, unknown to her, no longer existed. He followed up with a similar e-mail a few weeks later. Teresa refused to authorize any exercise of her options.
¶ 5 In late September, Daniel moved for the court to enforce the parties' CR 2A Agreement and enter the final decree dissolving the marriage. Daniel did not disclose that he had unilaterally exercised all the stock options. Meanwhile, in response to a subpoena for Daniel's bank account records, Teresa discovered that approximately $491,000 had been deposited into Daniel's account in August. The day before the court's scheduled hearing to finalize the dissolution, Teresa asked the court to continue entry of the final decree so she could investigate the source of the $491,000 in Daniel's *260 account. Opposing any delay, Daniel, through counsel, falsely advised the court that the $491,000 represented proceeds from Daniel's exercise of his share of the PACCAR stock options. The court denied Teresa's motion to continue, but ordered Daniel to produce all documents regarding the August exercise of the stock options. Daniel did not comply.
¶ 6 The court entered the decree of dissolution on October 13, 2006, dissolving the marriage and dividing the parties' community and separate property. The decree adopted the provision from the CR 2A Agreement that equally divided the PACCAR community stock options. Neither Teresa nor the court was aware the options had already been exercised and no longer existed.
¶ 7 Approximately two weeks later, Daniel, through new counsel, filed an affidavit admitting for the first time that he had cashed in all of the community stock options. Daniel moved to amend the decree to reflect that the options no longer existed. His motion proposed two alternative modifications to the decree as a way of preserving Teresa's interests. First, he offered to immediately distribute to Teresa approximately $170,000, an amount reflecting her share of the proceeds from the August sale of the PACCAR stock. Second, he proposed depositing approximately $190,000 into a trust account as a way of replicating Teresa's interest in the stock options. Under Daniel's proposal, Teresa could periodically choose to "exercise" the options as if they still existed, and proceeds from the trust account would be distributed to her according to the value of the PACCAR stock at the time of her "exercise."
¶ 8 With the revelation that Daniel had exercised her share of the options, Teresa moved for production of all documents related to the August sale. The court granted her motion, but Daniel again refused to comply. After being held in contempt, Daniel eventually produced the requested documents, which confirmed that he had exercised all of the community stock options back in August. In March 2007, Teresa moved for relief from the decree under CR 60(b) and requested that the court "re-open the decree and award [her] additional property, assets, or such relief as the court deems just and equitable to compensate" for her loss. Clerk's Papers (CP) at 147.
¶ 9 In support of her CR 60(b) motion, Teresa submitted a declaration from certified public accountant Ronald Nelson, who calculated Teresa's losses from the wrongful exercise of her stock options to be $617,553. Nelson arrived at this figure by analyzing the performance of PACCAR stock over the previous 10 years, which yielded an annual rate of return of 20.235 percent. Nelson explained in his declaration that "[i]f Ms. Farmer had held her options until the day before expiration, and the rate of return remained consistent, Ms. Farmer would have realized $617,553 on future exercises (dating from April 26, 2009 to January 14, 2013) using an estimated federal tax rate of 35% plus Medicare tax of 1.45%."[3] CP at 137.
¶ 10 Daniel filed his own declaration claiming Teresa's proposed valuation was "inappropriate and unreasonable." CP at 130. He did not, however, offer any competing analysis of the value of the stock options. Instead, Daniel renewed his motion for modification of the decree to allow him to establish a trust account that would provide periodic distributions to Teresa. The court denied Daniel's motion and granted Teresa's request for relief from the decree under CR 60(b) on the basis of fraud, surprise, and newly discovered evidence. The court assessed Teresa's damages according to the valuation of the stock options as set forth in the Nelson declaration.
¶ 11 Daniel moved for reconsideration. While he did not dispute the trial court's conclusion that his conduct constituted a fraudulent conversion of the stock options, he argued that the court made a legal error by basing the value of Teresa's losses on the projected price of the stock the day before each option expired several years in the future. Daniel cited for the first time In re *261 Marriage of Langham, 153 Wash.2d 553, 106 P.3d 212 (2005), and Brougham v. Swarva, 34 Wash.App. 68, 661 P.2d 138 (1983), arguing that these cases require damages for the conversion of stock and other property of fluctuating value to be based on the highest value of the asset at the time of conversion or a reasonable time thereafter. Under Daniel's proposed measure of damages, Teresa's losses would have been approximately $173,000. Daniel also argued that the court erred by failing to discount Teresa's losses to present value.
¶ 12 The court denied Daniel's motion for reconsideration and rejected his proposed valuation of the stock options, explaining that this measure of damages would fail to make Teresa whole and would reward Daniel's fraudulent conduct:
[T]he Court is a court of equity. And Mr. Farmer exercised the stock options in August fraudulently. He knew he didn't have the authority to do so. And he continued to hide his actions and lie to this Court and try to finesse Mrs. Farmer into agreeing that they should be sold so that he wouldn't have to disclose what he had done.
. . .
The judgment represents her loss. . . . She had the ability to exercise these stock options at some point in the future[n]ot just todaybut at some point in the future. And the only information that I have is what the value of those would be in the future is the expert opinion that was provided to me.
Now, I thought very long and hard because of the cases that you provided to this Court. And . . . I keep coming up against the block of why ifif we provide that the damages will be on the date the . . . stock options were exercised, then we are rewarding Mr. Farmer's wrongdoing. We are letting him have his way for something he knew was wrong, but he didn't have the authority to do.
. . .
It's not a windfall. It's the amount that she had the ability to exercise of her own free will. He took her own free will away from her.
Verbatim Report of Proceedings (VRP) (June 4, 2007) at 27-29. The court reaffirmed its original valuation of the stock options at $617,553, but agreed with Daniel that this amount should be discounted to present value. See id. at 29.
¶ 13 Both Daniel and Teresa followed up by submitting expert declarations discussing the appropriate discount rate for determining present value. Teresa's expert, Nelson, proposed a discount rate of six percent. Daniel's expert, Steven J. Kessler, countered with a rate between 15 and 20 percent. In addition, Kessler for the first time offered a critique of Nelson's original valuation of the stock options. Teresa moved to strike the portion of Kessler's declaration disputing the original valuation. The court granted Teresa's motion to strike, noting that "the time had passed" for challenging the valuation of the stock options and that the only remaining issue was the appropriate discount rate. VRP (Sept. 10, 2007) at 12-13; CP at 27-29. The court adopted a discount rate of six percent. On April 14, 2008, the court entered judgment for Teresa and awarded her $487,325 "in lieu of receipt of the PACCAR stock options referred to in the decree of dissolution of marriage." CP at 5. Daniel appealed.
¶ 14 The Court of Appeals affirmed in an unpublished opinion. In re Marriage of Farmer, noted at 157 Wash.App. 1054, 2009 WL 3584260. Focusing on the trial court's broad equitable authority to divide assets within the context of dissolution proceedings, the Court of Appeals explained that the trial court's measure of damages properly "put Teresa in as good a position as she would have been if Daniel did not act in bad faith and complied with the terms of the decree and the CR 2A Agreement." Id. at *9. The court distinguished Langham and Brougham, noting that "the trial court exercised its equitable authority to enforce the specific terms of the final decree and the CR 2A Agreement." Id. The court concluded that "[o]n this record . . . the [trial] court did not abuse its discretion in . . . awarding Teresa damages to compensate her for the loss of her right to exercise the stock options before the future expiration dates set forth in the *262 decree." Id. Daniel petitioned this court for review, which we granted at 168 Wash.2d 1026, 230 P.3d 1060 (2010).

ANALYSIS

Standard of Review
¶ 15 The parties dispute the proper standard of review. Teresa contends that we should review the trial court's award for abuse of discretion because the relief was granted pursuant to the court's equitable jurisdiction over the parties' dissolution. Daniel argues that whether the trial court applied a proper measure of damages is a question of law we should review de novo.
¶ 16 In a sense both parties are correct. Dissolution proceedings invoke the court's equitable jurisdiction. Langham, 153 Wash.2d at 560, 106 P.3d 212. Sitting in equity, a trial court enjoys broad discretion to grant relief to parties in a dissolution based on what it considers to be "just and equitable." RCW 26.09.080. Here, the trial court reopened the decree of dissolution to make a redistribution of property following Daniel's fraudulent conversion of the stock options awarded to Teresa. The court's actions fall squarely within its equitable jurisdiction over the parties' dissolution. We therefore review for abuse of discretion the trial court's ultimate remedy. See In re Marriage of Kraft, 119 Wash.2d 438, 450, 832 P.2d 871 (1992) (citing In re Marriage of Tower, 55 Wash.App. 697, 700, 780 P.2d 863 (1989)).
¶ 17 "A trial court abuses its discretion when its decision or order is manifestly unreasonable, exercised on untenable grounds, or exercised for untenable reasons." Noble v. Safe Harbor Family Pres. Trust, 167 Wash.2d 11, 17, 216 P.3d 1007 (2009). An error of law constitutes an untenable reason. Id.; Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 339, 858 P.2d 1054 (1993). And Daniel correctly points out that the measure of damages is a question of law. Shoemake v. Ferrer, 168 Wash.2d 193, 198, 225 P.3d 990 (2010) (quoting Womack v. Von Rardon, 133 Wash. App. 254, 263, 135 P.3d 542 (2006)). Thus, a trial court necessarily abuses its discretion if it awards damages based upon an improper method of measuring damages.

Valuation Method
¶ 18 At the time of dissolution, all property is brought before the court for a "just and equitable" distribution. RCW 26.09.080. With its equitable authority invoked, the court retains jurisdiction over all issues related to the decree of dissolution to ensure justice is administered properly. See Yount v. Indianola Beach Estates, Inc., 63 Wash.2d 519, 524-25, 387 P.2d 975 (1964). The court's continuing equitable jurisdiction includes the ability to grant whatever relief the facts warrant. Ronken v. Bd. of County Comm'rs, 89 Wash.2d 304, 313, 572 P.2d 1 (1977) (quoting Kreger v. Hall, 70 Wash.2d 1002, 1008, 425 P.2d 638 (1967)).
¶ 19 Langham illustrates how this plays out in the case of converted community assets. There the court entered a decree of dissolution dividing several thousand stock options between the husband and wife. Langham, 153 Wash.2d at 556, 106 P.3d 212. Years later, the husband cashed in the wife's share of the options on the mistaken belief they were his. Id. at 558, 106 P.3d 212. Immediately after the husband exercised the options, the stock plummeted, resulting in a substantial loss. Id. The wife moved to enforce the decree, seeking damages for the wrongful exercise of her share of the options. Id. at 558-59, 106 P.3d 212. In assessing damages against the husband, the court analogized to a conversion cause of action and measured damages based on the value of the stock at the time the options were exercised or converted. Id. at 558, 560, 106 P.3d 212. On review, we approved of the trial court's use of a tort law conversion measure of damages as a framework for granting equitable relief to the aggrieved wife. Id. at 560, 106 P.3d 212. We held that, at a minimum, the wife was entitled to recover the value of the stock at the time her options were converted. Id. at 569, 106 P.3d 212. But we left open the issue of damages when a converted asset increases in value, saying we would address that question "another day." Id.
*263 ¶ 20 Daniel argues this is that other day, but he misconstrues the import of our Langham decision. The trial court here granted relief on a similar theory as the trial court in Langham: Using the framework of conversion and tort damages, the court sought to place Teresa in as good a position as she would have been had Daniel not fraudulently converted her share of the stock options. VRP (June 4, 2007) at 27-29. In this regard, the court found support in the well-established theory of tort damages that seeks to make the tort victim whole. See, e.g., De-Nike v. Mowery, 69 Wash.2d 357, 358, 418 P.2d 1010, 422 P.2d 328 (1966) ("The purpose of awarding nonpunitive, pecuniary compensation to the injured party is to repair his injury, or to make him whole again as nearly as that may be done by an award of money."). The trial court explained that nothing in Langham foreclosed providing such relief to Teresa, but rather Langham supported a measure of damages that would make Teresa whole. VRP (June 4, 2007) at 27.
¶ 21 Daniel argues that the trial court erred as a matter of law by measuring damages in light of the projected value of the stock options on the latest date they could be exercised. In Daniel's view, there is only one answer to the question left open in Langham: Damages for conversion of stock options must be based on the highest value of the stock between the time the tort victim has notice of the conversion and a reasonable time thereafter, but under no circumstances can the reasonable time extend beyond the date of judgment. Teresa argues that the trial court's method for measuring damages was permissible and that we should defer to the court's choice of this particular method of valuing her loss.
¶ 22 We reject Daniel's proposal for a single, categorical rule for measuring the value of stock options when the stock price increases after conversion. In the first place, Langham itself does not suggest that such a rule exists. We noted in Langham that the parties had briefed "the issue of measuring damages in conversion actions when the property fluctuates [or increases] in value, as stock does." 153 Wash.2d at 569, 106 P.3d 212. But we decided to "leave that question for another day," as the stock in Langham declined rather than increased in value immediately after the options were converted. Id. Daniel's argument assumes that only one measure of damages can be correct when the asset increases in value. But we do not read Langham as foreshadowing the adoption of a single, categorical rule.
¶ 23 Moreover, the valuation of stock options does not lend itself to one universal approach. Determining the value of stock options is a complicated endeavor. See, e.g., Everett v. Everett, 195 Mich.App. 50, 53, 489 N.W.2d 111 (1992) ("Other jurisdictions have examined the issue regarding how to calculate the value of stock options, a formidable task given the numerous possible contingencies and restrictions involving stock options."). As a result, methods for valuing stock options and assets of fluctuating value vary widely, both in the context of dissolution actions and the context of tort actions.
¶ 24 In dissolution proceedings, courts have used three main approaches to valuing stock options: present value, retained jurisdiction, and deferred distribution. Tracy A. Thomas, The New Marital Property of Employee Stock Options, 35 FAM. L.Q. 497, 518-21 (2001). The present-value approach requires the court to measure the present value of a stock option and award the aggrieved party a lump-sum cash award at the time of dissolution. Id. at 519. Experts have developed a variety of models for calculating the stock options' present value under this approach. The most widely known model, the Black-Scholes formula, is "a complex method that reflects the interrelationship between market value and exercisability by taking into account eleven different variables." Id. at 518-19.[4] Two other models, the Shelton model and the Kassouf model, rely on "regression analysis of historical relationships among economic variables to estimate statistically the expected value of the option." Id. at 519 n. 116.
*264 ¶ 25 Some courts are reluctant to wade into the economic morass of ascertaining a present value for stock options, and instead defer any valuation until the options are exercised at some point in the future. Under the retained-jurisdiction approach, for example, the court does not grant a lump-sum cash award at dissolution, but instead retains jurisdiction over the property distribution until the holder cashes in the options, at which point the court enforces an equitable distribution of the proceeds. Id. at 521. Similarly, under the deferred-distribution approach, the court allocates rights in the stock options at the time of dissolution but refrains from making any award until the holder exercises the options at a later date. Id. Because the spouse who is the employee typically retains the stock options, under both the deferred-and retained-jurisdiction approaches courts have developed a variety of methods for securing the nonemployee spouse's interests pending the exercise of the stock options. Id.
¶ 26 In the context of a tort action for conversion, the approaches to valuing and measuring damages are equally varied. See generally C.B. Higgins, Annotation, Measure of Damages for Conversion of Corporate Stock or Certificate, 31 A.L.R.3d 1286, cmt. n. (1970). Some courts measure damages by the highest value of the stock between the time of conversion and a reasonable time after the victim receives notice of the conversion. Id. § 5[c] at 1317. New York courts have developed a similar rule that measures damages using the highest value of the stock between the time the victim learns of the conversion and a reasonable time thereafter. Id. § 5[d] at 1322-23. The New York rule excludes the time between the act of conversion and the victim's notice of the conversion on the theory that, if the victim had wanted to sell the stock during that interval, he would have learned of the conversion. In re Salmon Weed & Co., 53 F.2d 335, 341 (2d Cir.1931). While the New York rule has garnered some acceptance, it is still only one of at least seven accepted measures of damages for the conversion of stock. Royce de R. Barondes, An Alternative Paradigm for Valuing Breach of Registration Rights and Loss of Liquidity, 39 U. RICH. L. REV. 627, 636-39 (2005). The general acceptance of so many different approaches for valuing stock options and other assets of fluctuating value weighs against our adopting a single, universal approach for all cases. Cf. Scully v. U.S. WATS, Inc., 238 F.3d 497, 512 (3d Cir.2001) ("[G]iven the myriad factors that might arise in each case, we doubt that any single universal damage theory could properly value stock options in all situations.").,
¶ 27 One additional consideration cautions against adopting Daniel's categorical rule for valuation. Daniel advocates for our adoption of the New York rule, which measures damages by the highest value of the stock between the time the victim has notice of the conversion and a reasonable time thereafter. The rationale behind the "reasonable time thereafter" is to grant the conversion victim an interval of time in which she could theoretically reenter the market to purchase the stock that was converted and thus be returned to her preconversion position. Schultz v. Commodity Futures Trading Comm'n, 716 F.2d 136, 140 (2d Cir.1983). This rationale makes sense when dealing with assets that are readily replaceable on the market. But employment stock options, like those Daniel received from PACCAR, have no market and are irreplaceable. Thomas, supra, at 517 (explaining employment stock options "do[] not have an ascertainable market value because [they are] unassignable"); Scully, 238 F.3d at 508 (noting unlike other stock options, "employee stock options are not publicly traded"). Once converted, Teresa's stock options were gone forever, and Teresa could not even in theory have reentered the market to replace them. Adoption of the New York rule in the context of employee stock options would therefore make little sense because the rule's policy underpinnings are simply not present.[5]
*265 ¶ 28 Upholding the trial court's measure of damages in this case is consistent with the significant deference we accord trial courts in dissolution proceedings. In the context of valuing pensions, for example, we have developed a "`Iumpsum'" approach and a "`pay as it comes'" approach, In re Marriage of Wright, 147 Wash.2d 184, 190, 52 P.3d 512 (2002), which mirror approaches some courts use for valuing stock options. We have deferred to the equitable discretion of trial courts to use one approach over the other and have recognized that "[f]lexibility [is] especially important in allocating the community interest in a retirement plan." Id. at 196, 52 P.3d 512; see also Wilder v. Wilder, 85 Wash.2d 364, 369, 534 P.2d 1355 (1975) ("There can be no set rule for determining every [pension] case and as in all other cases of property distribution, the trial court must exercise a wise and sound discretion."). We are likewise hesitant to second-guess a trial court's equitable distribution of other assets that pose difficult valuation problems. See, e.g., In re Marriage of Hall, 103 Wash.2d 236, 242-43, 692 P.2d 175 (1984) (explaining that "several accounting or appraisal methods may be used" to value goodwill and that "selection of any one method for all cases would unnecessarily limit the court in making a fair and just distribution"). A similar notion of deference is evident from our reluctance to revisit a trial court's distribution of property when the court mischaracterizes assets as separate or community property but otherwise makes a just and equitable distribution. See Worthington v. Worthington, 73 Wash.2d 759, 768, 440 P.2d 478 (1968); In re Marriage of Zier, 136 Wash.App. 40, 46, 147 P.3d 624 (2006); see also In re Marriage of Pilant, 42 Wash.App. 173, 181, 709 P.2d 1241 (1985) (holding that erroneous valuation of pension was not reversible error where distribution was otherwise just and equitable).
¶ 29 The trial court granted to Teresa relief based on what it considered to be just and equitable under the circumstances of the case. Consistent with well-established tort law principles, the court sought to make Teresa whole by returning her to her preconversion position. The court did so by measuring Teresa's losses by the present value of her converted stock options, using a lump-sum or present-value approach to valuation. Because there are several possible methods for valuing converted stock options, we cannot conclude that the trial court erred as a matter of law by employing a tort measure of damages. We decline Daniel's invitation to adopt a single approach, particularly one that seems out of place in the context of employee stock options.[6]
¶ 30 As an alternative, Daniel argues that the court's calculation of damages was unduly speculative. The trial court based its calculation of damages on the Nelson declaration, which Teresa filed in support of her CR 60(b) motion. Daniel did not timely provide any expert testimony to contradict or otherwise challenge Nelson's calculation of damages.[7] Nor did Daniel provide any expert *266 testimony regarding the calculation of damages when he filed his motion for reconsideration. It was not until the court called for further information on the correct present-value calculation that Daniel submitted an expert opinion challenging Nelson's calculations. The court properly struck that testimony as untimely.
¶ 31 Our reluctance to second-guess the trial court's equitable authority is even more pronounced when we are asked to dictate not only a method of valuation, but also the calculation of damages under that method. As the Court of Appeals correctly observed, the calculation of damages is a question of fact, Farmer, 152 Wash.App. 1054, 2009 WL 3584260, at *9 (citing Womack, 133 Wash.App. at 263, 135 P.3d 542), and Daniel has not established that the amount of damages awarded by the trial court is unsupported by the evidence. Rather, he merely reiterates the same argument he made to the trial court that the damages are speculative. We fail to see how the trial court speculated when it based its damages award on the evidence presented.[8]
¶ 32 Daniel's real concern, therefore, does not seem to focus on the court's supposed speculation, but rather on expert Nelson's allegedly speculative calculations. Unlike the dissent, we decline to critique Nelson's calculations on review. As noted above, experts have developed a variety of highly complex models for valuing stock options. This is an evolving science that is properly addressed through expert testimony. To the extent parties desire to scrutinize and critique different valuation models through dueling expert testimony, we think the trial court provides the appropriate forum. In this case, the trial court weighed the Nelson declaration against Daniel's own assertions and found that the Nelson declaration provided the more credible and accurate calculation. We hold that, on this record, the trial court properly exercised its discretion in calculating damages.[9]

Attorney Fees
¶ 33 Teresa requested attorney fees at the Court of Appeals and renewed that request in her supplemental brief to this court. Under the terms of the parties CR 2A Agreement, "[t]he court may award attorney's fees in the event the court concludes in its discretion that either party has by his or her actions frustrated the terms of this agreement and or has acted in bad faith." CP at 458. Daniel has never challenged the trial court's finding that he acted in bad faith by converting Teresa's share of the community stock options. Because it was Daniel's act of bad faith that precipitated the appeal and this court's review, we grant Teresa's request for reasonable attorney fees.

CONCLUSION
¶ 34 Trial courts have broad equitable authority to grant relief and fashion appropriate remedies in dissolution proceedings. Consistent with our tradition of deference to the exercise of a trial court's equitable authority, we decline the invitation to adopt a one-size-fits-all approach to valuing converted stock options. The measure of damages used by the trial court below was one of several accepted approaches, and the amount of damages was properly based on the expert's calculation of the present value of Teresa's converted stock options. We affirm.
*267 WE CONCUR: CHARLES W. JOHNSON, GERRY L. ALEXANDER, TOM CHAMBERS, SUSAN OWENS, and MARY E. FAIRHURST, Justices.
WIGGINS, J. (dissenting).
¶ 35 I agree with the trial court that Daniel Farmer acted fraudulently when he exercised all of the stock options, including those he agreed should be awarded to Teresa and then concealed his fraud. I agree with the trial court, the appellate court, and the majority that the remedy for Daniel's misconduct must not be punitive and that the appropriate remedy would be to make Teresa whole by placing her in as good a position as she would have been in had Daniel not exercised Teresa's options. Majority at 262-63, 265, 266 n.8; In re Marriage of Farmer, noted at 152 Wash.App. 1054, 2009 WL 3584260, at *9-10.
¶ 36 But I dissent because the trial court has placed Teresa in a much better position than she would have been in had Daniel not exercised her options. This is apparent for several reasons. First, without a scintilla of evidence about when Teresa would have exercised her options, the trial court simply accepted Teresa's expert's calculations, which were based on the assumption that Teresa would have exercised each option on the last possible day before each option expired. Second, the expert assumed a straight-line growth rate in the value of PACCAR stock of 20.235 percent per year, eight years into the future. Third, the trial court then accepted Teresa's expert's discount rate of 6.0 percent, which unrealistically eliminated most of the risk of holding stock options until the day before expiration.
¶ 37 As the majority notes, "Determining the value of stock options is a complicated endeavor." Majority at 263. The majority points out that "courts have used three main approaches to valuing stock options: present value, retained jurisdiction, and deferred distribution." Majority at 263. But as the majority notes, the present value approach is highly fact-specific, involving analysis of many variables using complex formulas. The second and third models are not valuations at all, but simply opt to "wait and see," deferring the division of the stock options until someone chooses to exercise the options.
¶ 38 The majority also notes that there are at least seven accepted approaches for valuing damages for the conversion of stock. Majority at 264 (citing Royce de R. Barondes, An Alternative Paradigm for Valuing Breach of Registration Rights and Loss of Liquidity, 39 U. Rich. L.Rev. 627 (2005)).[1] We followed one of these approachesthe value of the property at the time of conversionin In re Marriage of Langham and Kolde, 153 Wash.2d 553, 106 P.3d 212 (2005). The Court of Appeals followed yet another of these formulas in Brougham v. Swarva, 34 Wash.App. 68, 77-78, 661 P.2d 138 (1983), in which the Court of Appeals held,
[W]here personal property which has a sharply fluctuating value is willfully converted and such conversion is fraudulently concealed by the converter, the measure of damages is the highest value of the property wrongfully and knowingly converted between the time of conversion and a reasonable time after the victim learns of such conversion. Such a rule protects the victim who has invested in property for speculative purposes when the market either rises or falls subsequent to the conversion. The innocent victim should not suffer a *268 loss because of the wrongful taking and withholding of his property. Neither should he be granted the windfall of complete umbrella protection by being awarded the highest possible valuation of the property from the time of its taking to the entry of judgment or its return.
(Citation omitted.) Though the converted property of fluctuating value in Brougham was silver coins, the rule could readily be applied here, where Daniel willfully converted Teresa's share of the stock options and fraudulently concealed the conversion.[2] Teresa should not suffer a loss from Daniel's wrongful exercise of her options, but neither should she be granted the windfall of blanket protection against the market's risk. See id.
¶ 39 Alternatively, courts sometimes use a different measure of damages if it is supported by the evidence. For example, in Greene v. Safeway Stores, Inc., 210 F.3d 1237 (10th Cir.2000), an employee testified that his wrongful discharge forced him to exercise his stock options and sell the shares within a few months because he needed cash to pay taxes and living expenses after his employment was terminated. Greene testified that he had planned to exercise his options shortly after he retired at age 55; instead, the wrongful discharge required him to exercise them two years earlier. Id. at 1243. Had Greene exercised his options later, he would have reaped the benefit of increases in the market price of Safeway stock. Id. Greene's planned retirement date was sufficient evidence of his professed intent to exercise his options at a later date.
¶ 40 Similarly, in KERS & Co. v. ATC Communications Group, Inc., 9 F.Supp.2d 1267 (D.Kan.1998), the parties entered a stock-option agreement that granted the plaintiff a 10-year right to acquire up to 225,000 shares at $1. Under the agreement, the plaintiff had "demand registration rights" that required the defendant to register the shares within 90 days of the plaintiff's request. Id. at 1269. The plaintiff requested registration in July 1996, but the defendant delayed registration until November 1996, more than 90 days after the request, in violation of the stock option agreement. Id. at 1270-71. Because of the changing market price of the shares, the plaintiff lost more than $2 million as a result of the breach and delay. Id. at 1271. The plaintiff presented "uncontroverted evidence" in the form of testimony from its trustees and minutes from a September board meeting (before the plaintiff became aware of the breach) "indicating that the shares would be sold as soon as possible after registration." Id. at 1272. This evidence was adequate to show that, had the breach not occurred, the plaintiff would have sold the shares for the higher price available in October.
¶ 41 By contrast, a court cannot simply assume that the victim of conversion would have exercised stock options at a specific time if no evidence supports the proposed exercise date. In Scully v. U.S. WATS, Inc., 238 F.3d 497 (3d Cir.2001), the court held that the wrongful discharge of Scully by WATS deprived Scully of his right to exercise stock options. Scully's stock option agreement gave Scully the right to purchase 850,000 shares of restricted stock at $0.75. Id. at 508. Upon exercising the option, the restriction on the stock prevented Scully from transferring the stock for one year from the date of the exercise. Id. Scully argued that the district court should have calculated his loss as of the expiration of the restrictive period because only then would he have been *269 able to sell his shares. Id. The Third Circuit Court of Appeals rejected Scully's argument, explaining that his approach was "unduly speculative." Id. at 512. The court held that "in the absence of a district court's express credibility finding or other convincing evidence, we cannot accept a plaintiff's after-the-fact assertion that he would have sold stock at a time that, in hindsight, would have been particularly advantageous." Id. at 512-13. The Third Circuit compared the facts in Scully to other cases where there was "adequate evidence [to confirm] a plaintiff's professed intent concerning the exercise of security interests." Id. at 513 n. 3.
¶ 42 Evidence of the kind presented in Greene and KERStestimony or pre-breach statements about the plaintiff's intent to exercise the optionsis notably absent in this case. Instead, the trial court awarded damages to Teresa in the amount of $487,325, an amount based on the declaration of Teresa's expert, Ronald Nelson, who stated, "If Ms. Farmer had held her options until the day before expiration, and the rate of return remained consistent, Ms. Farmer would have realized $617,553 on future exercises . . . ." Clerk's Papers (CP) at 137 (emphasis added). Nelson did not base his calculation of Teresa's loss on any evidence that she would have held her options until the day before expiration. He simply speculated, as did the trial court when it relied on his declaration. The trial court could not have relied on any competent evidence of Teresa's intent to exercise her options because the record does not contain any evidence of that intent.[3]
¶ 43 The trial court's assumption that Teresa would have held her options until the date before expiration is similar to the "after-the-fact assertion" the Scully court found inadequate to support an award based on a date that "in hindsight, would have been particularly advantageous" to the plaintiff. Scully, 238 F.3d at 513. In this case, an award based on the options' expiration dates is improperly based on speculation and conjecture.
¶ 44 Several facts demonstrate the excessiveness of the trial court's judgment. First, it is undisputed that Daniel netted a total of $444,664 upon his exercise of all the options, half of which belonged to Teresa and half to Daniel, but the trial court's judgment against Daniel was $487,325, over twice the amount received by Daniel for Teresa's half of the options. Second, if the trial court had used the formula followed by the appellate court in Brougham, Teresa would have received half as much as the trial court awarded. In Brougham, the court measured damages as "the highest value of the property wrongfully and knowingly converted between the time of conversion and a reasonable time after the victim learns of such conversion." 34 Wash. App. at 77, 661 P.2d 138. Applying this formula in this case results in damages of $237,450.[4] Third, whether or not Teresa's *270 expert's projection of a 20 percent annual increase in value was reasonable when he made the projection in March 2007, it was apparent by April 2008 when the trial court entered judgment that the stock market as a whole had suffered a steep decline. The high for PACCAR stock in March 2007 was $78 per share, and in March 2008, the high, adjusted for a three-for-two stock split, was $72.88 per share.[5]See PACCAR Inc. Historical Prices, YAHOO| FINANCE, http://finance.yahoo.com/q/hp?s=PCAR&a=07&b=14& c=2005&d=07&e=14&f=2008&g=m (last visited August 31, 2011). Instead of a 20 percent increase, the stock suffered an 8 percent decline during the period March 2007 to March 2008.
¶ 45 As the Court of Appeals concluded, the damage award was not deliberately punitive.[6]Marriage of Farmer, 152 Wash.App. 1054, 2009 WL 3584260, at *10. But the effect is certainly punitive; the trial court awarded damages to Teresa that exceed the total proceeds received by Daniel from the exercise of all the options, both his and hers. Accordingly, because I would hold that the trial court abused its discretion by awarding damages based on speculation unsupported by the record, I dissent. I would remand the case to the trial court to allow Teresa the opportunity to present evidence of her intent to exercise the options. If she cannot present credible evidence that she intended to hold the options, the trial court should calculate her damages based on the highest value of her stock options between the date she discovered Daniel's wrongful conversion and a reasonable period of time thereafter. This could be the date used as an example aboveapproximately one month after Daniel admitted selling Teresa's optionsor some other period of time determined by the trial court to be reasonable.
¶ 46 I dissent.
WE CONCUR: JAMES M. JOHNSON, Justice, and BARBARA A. MADSEN, Chief Justice.
NOTES
[1] We refer to the parties by their first names for purposes of clarity, intending no disrespect.
[2] Under the terms of the PACCAR stock option plan, if Daniel were terminated for cause, the options would be forfeited. If he was terminated without cause or he resigned, he would have between one and three months to exercise the options.
[3] Teresa also submitted an affidavit of her own saying, "Had affiant been in a position to exercise the stock options, for instance, on the day before each group of stock options expired, affiant would have been able to realize approximately $617,553.00 on future exercises." CP at 146.
[4] The Black-Scholes model won the Nobel Prize for economics in 1997. Thomas, supra, at 519. However, it has received criticism for not providing an accurate value for employee stock options, as it is designed to value only publicly traded stock options. Id.
[5] Not surprisingly, the parties do not cite a single case that has adopted the New York rule or one of its variants in the context of employment stock options. Still, Daniel argues the New York rule should govern and, relying on Roxas v. Marcos, 89 Hawai`i 91, 969 P.2d 1209 (1998), he argues that the absolute end point for the "reasonable time thereafter" is the date of judgment. We reject this arbitrary cutoff date for two reasons. First, Roxas's adoption of an "absolute end-point" occurred at the tail end of its discussion of the New York rulea rule that, as discussed above, has little relevance in the context of employee stock options that cannot be replaced on the open market. Id. at 150-52, 969 P.2d 1209. Second, Roxas did not propose the date of judgment as a universal cut-off date for all cases. Instead, the Roxas court imposed the cut off at judgment because it was concerned that the trier of fact on remand in that case would not have any evidence on which to base its valuation beyond that date. Id. at 152, 969 P.2d 1209 ("[A]pplying the New York rule to the present case, the date of close of the evidence at trial would, as a matter of law, be the absolute end-point beyond which the "reasonable time" cannot extend, inasmuch as the market values of the converted Buddha statue and gold bars beyond that date would be unknowable to the trier of fact." (emphasis added)). Here, by contrast, the trial court had sufficient evidence in the record upon which to base its damages award.
[6] For the same reason, we decline to follow the dissent in adopting the "reasonable time after" rule from Brougham, 34 Wash.App. at 77, 661 P.2d 138. Dissent at 267-68, 269.
[7] At the hearing on Teresa's CR 60(b) motion, Daniel requested for the first time that the court set an evidentiary hearing for a later date so he could cross-examine Nelson. The court denied this request. The Court of Appeals affirmed the trial court's decision, holding that Daniel's request for an evidentiary hearing was untimely. Farmer, 152 Wash.App. 1054, 2009 WL 3584260, at *11 (citing In re Marriage of Rideout, 150 Wash.2d 337, 352, 77 P.3d 1174 (2003)). Daniel did not raise this issue in his petition for review or supplemental brief to this court, and we thus decline to address it.
[8] Although Daniel never made the argument before this court, the dissent suggests that the damages award was punitive. We agree with the dissent that "[a]n award intended to punish Daniel for the wrongful conversion would be improper." Dissent at 270 n. 6. We agree with the trial court and the Court of Appeals that the award was based on the evidence and was not punitive.
[9] In a footnote to his supplemental brief, Daniel reiterates an argument rejected by the Court of Appeals that the trial court should have used a discount rate of 20.325 percent instead of 6.0 percent. In a separate footnote, he argues that the Court of Appeals erred by striking his motion to supplement the record with new evidence related to PACCAR stock prices. Because Daniel did not raise either of these issues in his petition for review, we do not address them. RAP 13.7(b).
[1] The seven measures of damages are:

(i) the value at the time of the conversion; (ii) the highest value from the time of the conversion to a reasonable period of time thereafter; (iii) the highest value from the time of the conversion to a reasonable period of time after the owner has notice of the event; (iv) the highest value from the time the owner has notice of the conversion to a reasonable period of time thereafter; (v) the higher of the value at the time of the conversion and the highest value from the time the owner has notice of the conversion to a reasonable period of time thereafter; (vi) the highest value from the time of the conversion until the time the lawsuit is filed; and (vii) the highest value from the time of the conversion until the time of trial or the time a verdict or judgment is issued.
Barondes, supra, at 636-39 (footnotes omitted). While the numerous approaches demonstrate that this area of law is in "severe disarray," Id. at 632, it is notable that none of the accepted approaches relies on speculation. Instead, each approach bases the damage award on documented values of the stock.
[2] The majority rejects a rule awarding damages based on the converted property's value between the time of conversion and a reasonable time after the victim learns of the conversion because the rule relies on the victim's ability to reenter the marketplace, an impossibility where the converted property, like stock options, is irreplaceable. Majority at 264. But the "reasonable period of time thereafter" rule rejected by the majority does not require the victim to reenter the market, it uses possible reentry only as a means of establishing "the outer time limit of a reasonable period during which the highest intermediate value of the lost stock could be ascertained." Schultz v. Commodity Futures Trading Comm'n, 716 F.2d 136, 140 (2d Cir.1983). The Third Circuit Court of Appeals in Scully did not reject recovery for the conversion of stock options on the basis of the rule and explained that it allows at least "a limited recovery" of the benefit of the victim's bargainnamely, the inherent nature of a stock option that provides its holder with "a reduced risk of loss and a greater likelihood of profit." Scully v. U.S. WATS, Inc., 238 F.3d 497, 512 (3d Cir.2001).
[3] A search of the record revealed only one statement regarding Teresa's intention toward the stock options. Teresa stated,

I had already sought counsel in regards to the exercise of my share of the stock options and had planned on exercising the options in smaller stages and holding on to the shares of stock in order to pay an alternative minimum tax liability of 15% rather than the 37.5% tax that Mr. Farmer will pay since he exercised all of the options and took the money all at once. . . .
CP at 584. This does not support an assumption that Teresa would have held the options until the date before each expired, because, as shown by the calculations of Teresa's expert, the exercise of the option triggers a tax on the difference between the market price and the exercise price, whether or not the holder of the options sells or holds the stock. Nor did the trial court refer to this statement to support the award of damages. In contrast, there is evidence to support an assumption that Teresa might have sold the options sooner because she needed the income. Teresa stated it took time to "adjust to [her] current income level" because the dissolution forced her "to make huge adjustments and changes in lifestyle and spending habits." CP at 591.
[4] Nelson calculated that Daniel exercised 7,447 (total options less 125 not exercised) of Teresa's options at a total exercise cost of $124,413 (sum of adjusted exercise price multiplied by options exercised for each grant). See CP at 141. The record reveals that from the date of exercise, August 14, 2006, to November 27, 2006 (which was just over one month after Teresa learned that Daniel had exercised the options), the highest value of the PACCAR stock was $66.88 during the week of November 13. CP at 598. To exercise the options at this price, Teresa would have to pay the exercise price plus taxes on the difference between the market price and the exercise price. The damages would equal $498,055 ($66.88 multiplied by 7447 shares), minus the exercise price of $124,413, minus the taxes that would have been due on the exercise of the options. Nelson calculated that the taxes would equal 36.45 percent of the difference between the selling price of the stock and the exercise price, which results in a tax bill of $136,193. When the taxes are deducted, Teresa should have received at most $237,450, or roughly half of the damages awarded by the trial court.
[5] The March 2008 high was $48.44. Multiplying by 3/2, or 1.5, the split-adjusted high was $72.88.
[6] "Since its earliest decisions, this court has consistently disapproved punitive damages as contrary to public policy. Punitive damages not only impose on the defendant a penalty generally reserved for criminal sanctions, but also award the plaintiff with a windfall beyond full compensation." Dailey v. N. Coast Life Ins. Co., 129 Wash.2d 572, 574, 919 P.2d 589 (1996) (citation omitted). An award intended to punish Daniel for the wrongful conversion would be improper.